# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF VERMONT

In re:

Roman Catholic Diocese of Burlington, Vermont,[1]

    Debtor.

Case No.: 24-10205-HZC

Chapter 11 Case

## DEBTOR'S MEMORANDUM IN SUPPORT OF ORDINARY COURSE PAYMENTS OF VESTED RETIREMENT BENEFITS

The Roman Catholic Diocese of Burlington, Vermont (the "Diocese"), submits this memorandum in support of its ordinary course payments of vested retirement benefits pursuant to the Court's *Extended Interim Order Authorizing the Debtor to Pay Certain Accrued and Outstanding Pension, Benefits, and Related Amounts for Retired Priests in the Ordinary Course and Scheduling Order* (ECF No. 181) (the "Extended Interim Order"). Ordinary course payment of the vested retirement benefits falls well within the Diocese's business judgment, conforms with applicable legal requirements of the Diocese, and limits potential liability for the Diocese. The Official Committee of Unsecured Creditors (the "Committee") has not, and cannot, put forward any argument or evidence that proves continued payment of the vested retirement benefits does not fall within the ordinary course of the Diocese's business or that the Diocese's continued payment does not constitute a good faith exercise of discretion. Accordingly, the Court should enter a final order approving continued payment of the vested retirement benefits.

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005 and 11 U.S.C. § 342(c), as applicable, the Diocese's address is 55 Joy Drive, South Burlington, Vermont 05403, and its Employer Identification Number (EIN) is 03-0180730.

The Diocese conferred with the Office of the United States Trustee and counsel for the Committee prior to the filing of this Motion.

## GENERAL BACKGROUND

### I. THE DIOCESE PROVIDES ELIGIBLE PRIESTS WITH RETIREMENT BENEFITS THROUGH THE BENEFIT PLAN AND TRUST AGREEMENT.

1. Effective July 1, 1952, the Diocese established a pension plan for the benefit of the ordained priests serving the Diocese to ensure the ordained priests, upon retirement, received certain retirement and health benefits as required by Canon Law. (Affidavit of Bishop John J. McDermott ("McDermott Aff.") ¶ 7.)

2. On or about February 16, 2006, the Diocese executed and adopted the Priests' Benefit Fund Retirement Plan (the "Benefit Plan"), which amended the Diocese's original pension plan. A true and correct copy of the Benefit Plan is attached to the McDermott Aff. filed simultaneously herewith as **Exhibit A**. The Benefit Plan provides eligible priests of the Diocese with monthly pensions over the remaining lives of the priests.

3. Employee priests of the Diocese become eligible to participate in the Benefit Plan on the date of their ordination. (McDermott Aff. Ex. A ¶ 3.1.) The Benefit Plan defines an "Eligible Employee" as "any Employee who is an ordained priest and who has not attained age 70 by participation date. A priest who becomes dissociated with the Diocese isn't eligible." (*Id.* Ex. A ¶ 1.13.)

4. Eligible Employees are entitled to receive their monthly pension starting on the date of their retirement and continuing for life. (*Id.* Ex. A ¶¶ 5.1, 5.2, 5.6.) An Eligible Employee's benefits under the Benefit Plan become "fully vested" upon reaching the age of 60 and completing at least 20 years of service with the Diocese. (*Id.* Ex. A ¶ 1.12.) A "vested" benefit is nonforfeitable. (*Id.* Ex. A ¶ 1.39.)

5. The administrator of the Benefit Plan, the Diocese, determines whether an employee qualifies as "eligible" under the Benefit Plan terms. (*Id.* Ex. A ¶¶ 2.3(a), 3.3.) Nonetheless, "[t]he primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan." (*Id.* Ex. A ¶ 2.3.)

6. In tandem with the Benefit Plan, on or about February 16, 2006, the Diocese, on the one hand, and the Bishop of the Diocese, the Chancellor of the Diocese, the Finance Officer of the Diocese, and members of the Priests Benefit Fund Prudential Committee, on the other hand, executed the Priests' Benefit Fund Retirement Plan Trust Agreement (the "Trust Agreement"). A true and correct copy of the Trust Agreement is attached to the McDermott Aff. as **Exhibit B**.

7. The Trust Agreement carries into effect the provisions of the Benefit Plan by creating a trust (the "Trust"), which holds the assets funding the Benefit Plan. (McDermott Aff. Ex. B ¶ 1.1(a).) The Trust is made up of outside contributions, such as bequeathments made pursuant to third party wills, meant for the sole purpose of funding retirement benefits for the Diocese's priests.[2] (*See id.* Ex. B ¶¶ 1.1, 4.1, 5.1.) All payments made from the Trust are for the sole benefit of the retired priests, pursuant to the terms of the Benefit Plan. (*Id.* Ex. B ¶ 7.6.) The Bishop of the Diocese, the Chancellor of the Diocese, the Finance Officer of the Diocese, and members of the Priests Benefit Fund Prudential Committee all qualify as "Trustees" under the Trust Agreement and over the Benefit Plan. (*See id.* Ex. B.) The Trust was created, and is subject to, Vermont law. (*Id.* Ex. B ¶ 7.2.)

---

[2] At this time, the Diocese does not seek a determination by the Court regarding whether the Trust constitutes property of the estate under 11 U.S.C. § 541. However, the Diocese does not believe that the Trust constitutes property of the estate and expressly reserves the right to later seek such a determination. Nothing contained in this brief shall constitute an admission or waiver regarding whether the Trust constitutes property of the estate.

## II. THE DIOCESE SEEKS GUIDANCE FROM THE HOLY SEE ON TREATMENT OF TWO CREDIBLY ACCUSED PRIESTS.

8. In 2004, the Diocese followed applicable procedures under Canon law for five accused priests, thereby seeking guidance from the Holy See on how to proceed as to treatment of the priests. (McDermott Aff. ¶ 14.) This included the two credibly accused priests currently receiving vested pension benefits from the Benefit Plan (the "Priests"). (*Id.*) The Priests are retired and, aside from the benefits under the Benefit Plan, do not receive any other compensation from the Diocese. (*Id.*) The Priests are not involved in active ministry. (*Id.*)

9. Treatment could have included laicization and/or rendering the Priests ineligible for benefits. (*Id.* ¶ 15.) However, based on Canon Law, the Holy See determined that the Priests could not be laicized or their benefits terminated. (*Id.*) The Priests remain retired, ordained priests of the Diocese. (*Id.*)

10. While the Diocese agrees that the accusations against the Priests are credible, the Priests have otherwise not been criminally charged or been the subject of civil or criminal judgments related to the allegations of sexual abuse. (*Id.* ¶ 16.)

11. The Priests receive a collective total of $3,900 per month in pension benefits from the Benefit Plan. (*Id.* ¶ 17.)

## III. THE DIOCESE SEEKS APPROVAL OF ORDINARY COURSE PAYMENT OF THE BENEFIT FUND.

12. On September 30, 2025, the Diocese filed its *Emergency Motion and Memorandum for an Order (I) Authorizing the Debtor to Pay Accrued and Outstanding Prepetition Employee Compensation, Benefits, and Related Amounts and (II) Authorizing the Debtor to Maintain Existing Payroll Service* (the "Employee Benefits Motion"). (ECF No. 8.) Pursuant to the Employee Benefits Motion, the Diocese sought an order approving the payment of prepetition benefits of employees that had accrued, but remained unpaid, under the Benefit Fund. (ECF No.

8 ¶¶ 41–45.) On December 17, 2024, the Court entered its *Interim Order Authorizing the Debtor to Pay Certain Accrued and Outstanding Pension, Benefits, and Related Amounts for Retired Priests in the Ordinary Course* (the "<u>Interim Order</u>"). (ECF No. 126.)

13. Pursuant the Interim Order, the Court authorized the Diocese to pay accrued but unpaid prepetition benefits under the Benefit Plan and to continue making payments under the Benefit Plan. (ECF No. 126 ¶ 3.)

14. Then, on January 29, 2025, the Court entered its Extended Interim Order, under which it ordered the Diocese to "file with the Court a brief outlining and supporting its position that certain obligations owed to credibly accused priests should continue without interruption." (ECF No. 181 ¶ 1.)

## IV. THE COMMITTEE REQUESTS THAT THE DIOCESE DISCONTINUE BENEFIT PLAN PAYMENTS TO THE PRIESTS.

15. After the filing of the Employee Benefits Motion, the Committee raised issue with the Diocese's ordinary course payments to the Priests, requesting that the Diocese discontinue those payments.

16. The Diocese responded to the Committee's request and informed the Committee that the Diocese could not discontinue those payments as discontinuing them could create post-petition liability for a breach of the Benefit Plan.

17. The Diocese and the Committee engaged in discussions regarding a resolution of this issue but ultimately could not reach an agreement.

18. As of the date of this brief, the Committee has not filed a formal objection to the Employee Benefits Motion, so the Diocese does not yet fully know the legal basis for the Committee's argument that the Diocese should discontinue payments to the Priests under the Benefit Plan.

# ARGUMENT

I. **THE COMMITTEE'S REQUESTED RELIEF MUST BE DENIED BECAUSE THE BENEFIT FUND PAYMENTS ARE ORDINARY COURSE PAYMENTS OF THE DIOCESE.**

19. Pursuant to 11 U.S.C. § 363(c)(1),

> If the business of the debtor is authorized to be operated under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1). "The § 363 mandate necessarily includes the concomitant discretion to exercise reasonable judgment in ordinary business matters." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re T.A. Brinkoetter & Sons, Inc.*, No. 09-80727, 2012 WL 1865485, at *4 (Bankr. C.D. Ill. May 22, 2012) ("In furtherance of the rehabilitative purpose of chapter 11, a debtor in possession is allowed to operate its business within the broad parameters of sound business judgment, and is authorized and required to pay debts incurred in the ordinary course of business.").

20. The term "ordinary course of business generally has been accepted to embrace the reasonable expectations of interested parties of the nature of the transactions that the debtor would likely enter in the course of its normal, daily business." *In re Lavigne*, 114 F.3d 379, 384 (2d Cir. 1997). Two tests are employed to determine whether a transaction is ordinary—"(1) the creditor's expectation test also known as the vertical test, and (2) the industry-wide test also called the horizontal test ." *Id*. Under this two-part test, "the touchstone of ordinariness is thus the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the course of its business." *Id.* at 384–85. In connection with the vertical test, a court views "the disputed transaction from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when

he decided to enter into a contract with the debtor." *Id.* at 385 (citation omitted). The horizontal test involves "an industry-wide perspective in which the debtor's business is compared to other like businesses. In this comparison, the test is whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Id.* (citation omitted). It is in the ordinary course of business for a company to pay wages, salaries, and employee benefits. *See In re Tusa-Expo Holdings, Inc.*, 2008 WL 4857954, *4 (Bankr. N.D. Tex. 2008).

21. As previously described in the Employee Benefits Motion, payment of continuously accruing employee retirement benefits is in the ordinary course of business for a company. (*See* ECF No. 8 at 10–11 (citing *In re Tusa-Expo Holdings, Inc.*, 2008 WL 4857954, at *4); ECF No. 8-1 ¶ 5.) And, in particular, the ongoing Benefit Plan payments to the Priests are payments of employee retirement benefits in the ordinary course. First, the payments satisfy the vertical test. The Diocese has paid pension funds to eligible priests since at least 1952, and through the current version of the Benefit Plan since 2006. And a hypothetical creditor would expect the Diocese to continue making such payments in the ordinary course to prevent the accrual of administrative priority claims and potential litigation liability from the Diocese's failure to pay vested pension benefits. Otherwise, the hypothetical creditor's potential payout from the bankruptcy case would likely be reduced.

22. Second, other like Chapter 11 Catholic diocesan debtors continue to pay ongoing, postpetition pension benefits. *See In re Tusa-Expo Holdings, Inc.*, 2008 WL 4857954, at *4; *see, e.g.*, *The Roman Catholic Diocese of Albany, New York*, Case No. 23-10244 (REL), ECF Nos. 9, 40, 147, 192 (Bankr. N.D.N.Y. 23); *The Norwich Roman Catholic Diocesan Corp.*, Case No. 21-20687 (JJT), ECF Nos. 13, 61, 237, 286 (Bankr. D. Conn. 2021); *The Roman Catholic Diocese of Syracuse, New York*, Case No. 20-30663 (WAK), ECF Nos. 10, 26, 76 (Bankr. N.D.N.Y. 2020); *In re The Diocese of Buffalo, N.Y.*, Case No. 20-10322 (CLB), ECF Nos. 11, 250, 253 (Bankr.

W.D.N.Y. May 29, 2020); *In re Diocese of Rochester, Inc.*, Case No. 19-20905 (PRW), ECF Nos. 9, 199, 269 (Bankr. W.D.N.Y. Nov. 8, 2019). The payments thus meet the horizontal test.

23. The Committee never submitted a formal objection to, nor has it put forward a basis for why, the ongoing, postpetition payments to the Priests are not in the ordinary course of the Diocese's business. The reason why is clear: the challenged payments are clearly ordinary course payments within the business judgment of the Diocese under applicable law. Accordingly, the relief sought by the Committee should be denied and the Court should enter a final order approving continued payments under the Benefit Fund.[3]

## II. CONTINUING BENEFIT PLAN PAYMENTS IS WITHIN THE BUSINESS JUDGMENT OF THE DIOCESE.

24. Even if continuing Benefit Plan payments was considered outside of the ordinary course of the Diocese's business, continuation of those payments would fall within the Diocese's sound business judgment. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . . ." 11 U.S.C. § 363(b)(1). "Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can articulate a sound business justification for doing so." *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 590 (Bankr. S.D.N.Y. 2024). A debtor's business judgment "is entitled to great deference." *Id.* "Once a debtor articulates a sound business justification, there is a presumption that in making a business decision the decision maker acted

---

[3] Because the Committee neither filed a formal objection nor articulated its legal position as of the date of this brief, the Diocese reserves its right to respond to the Committee's arguments made within its responsive memorandum at the scheduled hearing.

on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *Id*. (internal quotation omitted).

25. Here, continuing the Benefit Plan payments to the Priests falls well within the Diocese's sound business judgment. The controlling documents (i.e. the Benefit Plan and Trust Agreement) simply do not allow the Diocese to exercise discretion to terminate the Benefit Plan payments. A priest is eligible for benefits under the Benefit Plan if the priest is an "Eligible Employee," which requires the priest to be "an ordained priest and who has not attained age 70 by his participation date." (McDermott Aff. Ex. A ¶¶ 1.13, 3.1.) An Eligible Employee that provides services for the Diocese becomes a "Participant" under the Benefit Plan. (*Id*. Ex. A ¶¶ 1.28, 3.2.) When a priest retires, the priest becomes a "Retired Participant" under the Benefit Plan and the accrued benefits become fully vested. (*Id*. Ex. A § 1.12, 1.26, 1.32.)

26. The Benefit Plan provides the Diocese with "discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan." (*Id*. Ex. A § 2.3(a).) Presumably, the Committee believes the Diocese could terminate the Benefit Plan payments to the Priests based on this discretionary provision. However, the Diocese disagrees with that analysis and, at best, believes discontinuation of the Benefit Plan payments would result in potential, post-petition liability to the detriment of the bankruptcy estate.

27. First, section 2.3(a) of the Benefit Plan provides discretion to the Diocese solely as to the eligibility of "Employees" and "Participants," but is silent as to whether the Diocese can exercise discretion as to "Retired Participants." (*Id*. Ex. A § 2.3(a).) The lack of express authority to determine eligibility of Retired Participants means the Diocese lacks clear authority to stop making payments to the Priests, who are Retired Participants under the terms of the Benefit Plan. This lack of authority is further demonstrated by the way the Benefit Plan describes the benefits

to which Retired Priests are entitled. Section 1.39 of the Benefit Plan describes the vested benefits of a Retired Priest as "non-forfeitable." (*Id.* Ex. A § 1.12, 1.26.) Based on this language, the Diocese does not have discretion to determine the eligibility of the Priests to participate in the Benefit Plan and cannot stop making the "non-forfeitable" payments to the Priests.[4]

28. Second, even if the Diocese had the discretion to determine the eligibility of the Retired Participants and could stop making Benefit Plan payments to the Priests under the terms of the Benefit Plan, that discretion is not unlimited. The terms of the Benefit Plan clearly limit that discretion by describing the Diocese's "primary responsibility" as administering "the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan." (McDermott Aff. Ex. A ¶¶ 2.3(a), 3.3.) Describing the Benefit Plan payments as "nonforfeitable" further confirms the limit of discretion. (*Id.* Ex. A ¶ 1.39.)

29. Moreover, both Vermont trust law and contract law limit the exercise of discretion in scenarios such as this. Under Vermont trust law, the Trustees (including the Bishop) of the Trust are required to act in "good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Vt. Stat. tit. 14A, §§ 105, 801, 802, 808. Even where a trustee has discretion, "the trustee shall exercise a discretionary power in good faith and in accordance with the terms and purposes of the trust and the interests of the beneficiaries." Vt. Stat. tit. 14A, § 814(a)); *Mansfield v. Rutland Mfg. Co.*, 52 Vt. 444, 447 (1880) (requiring the trustee to act in good faith when exercising the trustee's own discretion). Vermont contract law recognizes

---

[4] The Diocese treats the Benefit Plan as a non-electing church plan, which means that certain ERISA restrictions do not apply. However, if a court were to determine that ERISA applied to the Benefit Plan, fully-vested accrued benefits cannot be forfeited without the participant's consent. 29 U.S.C. § 1053; *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 749–51 (2004) (describing "vesting" as "the process by which an employee's already-accrued pension account becomes irrevocably his property"); *Sprague v. General Motors Corp.*, 133 F. 3d 388 (6th Cir. 1998) ("To vest benefits is to render them forever unalterable.").

the implied covenant of good faith and fair dealing, which applies to discretionary provisions in contracts. *Carmichael v. Adirondack Bottled Gas*, 635 A.2d 1211 (Vt. 1993) (describing the implied covenant of good faith and fair dealing).

30. The Diocese holds valid concerns that, if any party-in-interest challenged the Diocese's exercise of discretion under section 2.3(a) of the Benefit Plan, the Diocese and the bankruptcy estate would be subject to breach of contract, breach of trust, and breach of good faith claims based on the existing facts.

31. The Diocese already sought guidance on discontinuing benefits under Canon Law. The Diocese was directed that it could not laicize the Priests or discontinue their benefits. Further, while the Diocese believes the accusations against the Priests are credible, no court of law or other legal body has found the Priests guilty or liable for the accusations. Due to these facts, the Diocese believes the discretionary cancellation of the Priests' benefits under the Benefit Plan would subject the Diocese to potential post-petition legal claims, to the detriment of the bankruptcy estate.

32. Based on the small amount of the Benefit Plan payments (approximately $3,900), in an exercise of the Diocese's business judgment, the Diocese believes the risk of post-petition liability outweighs the benefit of termination of Benefit Plan payments.[5]

## CONCLUSION

33. The Diocese respectfully requests that this Court enter a final order:

    a. Approving continued payment of employee benefits; and

    b. Granting such other relief as the Court deems just and equitable.

---

[5] Regardless of whether the Benefit Plan payments are considered in or outside of the Diocese's ordinary course of business, the clear language of the controlling documents, applicable Vermont law, the Diocese's inability to discontinue benefits under Canon Law, and the risk of liability for discontinuing the benefits all present valid, standalone reasons why the Diocese cannot discontinue the Benefit Plan payments as requested by the Committee.

Dated: February 18, 2025        /s/ *Steven R. Kinsella*
Raymond J. Obuchowski
**OBUCHOWSKI LAW OFFICE**
1542 Route 107, PO Box 60
Bethel, VT 05032
(802) 234-6244
ray@oeblaw.com

James L. Baillie (*pro hac vice*)
Steven R. Kinsella (*pro hac vice*)
Samuel M. Andre (*pro hac vice*)
Katherine A. Nixon (*pro hac vice*)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000
jbaillie@fredlaw.com
skinsella@fredlaw.com
sandre@fredlaw.com
knixon@fredlaw.com

**ATTORNEYS FOR THE ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT**