## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF VERMONT

In re:

Roman Catholic Diocese of Burlington, Vermont,[1]

        Debtor.

Case No.: 24-10205-HZC
Chapter 11 Case

## AFFIDAVIT OF BISHOP JOHN J. MCDERMOTT IN SUPPORT OF THE DEBTOR'S MEMORANDUM IN SUPPORT OF ORDINARY COURSE PAYMENTS OF VESTED RETIREMENT BENEFITS

I, John J. McDermott, being duly sworn, deposes and states:[2]

1.      I am the Bishop of the Roman Catholic Diocese of Burlington, Vermont (the "Diocese"). I was ordained to the priesthood on June 3, 1989. Since my ordination, I have served as (a) parochial vicar at St. Augustine Parish in Montpelier, Vermont, (b) chaplain at Rice Memorial Catholic High School, (c) Administrator and later Pastor of Assumption of the Blessed Virgin Mary Parish in Middlebury, Vermont, and also of St. Bernadette Parish, in Bridport, Vermont, (d) Catholic Chaplain to Middlebury College, (e) Associate Director of the Catholic Center at the University of Vermont, (f) Pastor of St. Thomas Parish in Underhill, Vermont, and also of St. Mary Parish in Cambridge, Vermont, (g) Vice-Chancellor of the Diocese, (h) Chancellor of the Diocese, and (i) Moderator of the Curia.

---

[1] In accordance with Fed. R. Bankr. P. 2002(n) and 1005 and 11 U.S.C. § 342(c), as applicable, the Diocese's address is 55 Joy Drive, South Burlington, Vermont 05403, and its Employer Identification Number (EIN) is 03-0180730.

[2] All defined terms herein have the same meaning as used in the Diocese's *Memorandum in Support of Ordinary Course Payments of Vested Retirement Benefits* unless otherwise defined herein.

2.      In June of 2009, I was appointed Vicar General of the Diocese and served in that role until the year 2014, when I served as Apostolic Administrator of the Diocese.  I was reappointed Vicar General and served in this capacity until October 2023, when I was elected as Diocesan Administrator of the Diocese after the appointment of Bishop Christopher J. Coyne as Coadjutor Archbishop of Hartford.  During that time, I served on the Diocesan Tribunal as the Defender of the Bond and Promoter of Justice, Pastor of Christ the King-St. Anthony Parish, Burlington, Vermont, and as Director of The Catholic Center at the University of Vermont.

3.      In 2004 I earned the degree of Licentiate in Canon Law, which are the laws of the Catholic Church.[3]

4.      On July 15, 2024, I was Ordained and Installed as the 11th Bishop of the Diocese.

5.      I am familiar with the history, structure, and mission of the Diocese.  I am also familiar with the Diocese's day-to-day operations, business affairs, and records.

6.      I make this Declaration in support of the Diocese's *Memorandum in Support of Ordinary Course Payments of Vested Retirement Benefits* filed simultaneously herewith.

7.      Effective July 1, 1952, the Diocese established a pension plan for the benefit of the ordained priests serving the Diocese to ensure the ordained priests, upon retirement, received certain retirement and health benefits as required by Canon Law.

8.      On or about February 16, 2006, the Diocese executed and adopted the Priests' Benefit Fund Retirement Plan (the "Benefit Plan"), which amended the Diocese's original pension plan.  A true and correct copy of the Benefit Plan is attached hereto as **Exhibit A**.  The Benefit

---

[3] The universal Catholic Church seated in the Vatican and headed by Pope Francis and all other Catholic entities, including the Diocese, are subject to Canon Law.  Canon Law was originally codified in 1917 and subsequently amended in 1983.

Plan provides eligible priests of the Diocese with monthly pensions over the remaining lives of the priests.

9.      Employee priests of the Diocese become eligible to participate in the Benefit Plan on the date of their ordination.  The Benefit Plan defines an "Eligible Employee" as "any Employee who is an ordained priest and who has not attained age 70 by participation date. A priest who becomes dissociated with the Diocese isn't eligible."

10.      Eligible Employees are entitled to receive their monthly pension starting on the date of their retirement and continuing for life.  An Eligible Employee's benefits under the Benefit Plan become "fully vested" upon reaching the age of 60 and completing at least 20 years of service with the Diocese.  A "vested" benefit is nonforfeitable.

11.      The administrator of the Benefit Plan, the Diocese, determines whether an employee qualifies as "eligible" under the Benefit Plan terms.   Nonetheless, "[t]he primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan."

12.      In tandem with the Benefit Plan, on or about February 16, 2006, the Diocese, on the one hand, and the Bishop of the Diocese, the Chancellor of the Diocese, the Finance Officer of the Diocese, and members of the Priests Benefit Fund Prudential Committee, on the other hand, executed the Priests' Benefit Fund Retirement Plan Trust Agreement (the "Trust Agreement").  A true and correct copy of the Trust Agreement is attached hereto as **Exhibit B**.

13.      The Trust Agreement carries into effect the provisions of the Benefit Plan by creating a trust (the "Trust"), which holds the assets funding the Benefit Plan.  The Trust is made up of outside contributions, such as bequeathments made pursuant to third party wills, meant for the sole purpose of funding retirement benefits for the Diocese's priests.  All payments made from

the Trust are for the sole benefit of the retired priests, pursuant to the terms of the Benefit Plan. The Bishop of the Diocese, the Chancellor of the Diocese, the Finance Officer of the Diocese, and members of the Priests Benefit Fund Prudential Committee all qualify as "Trustees" under the Trust Agreement and over the Benefit Plan. The Trust was created, and is subject to, Vermont law.

14.     In 2004, the Diocese followed applicable procedures under Canon law for five accused priests, thereby seeking guidance from the Holy See on how to proceed as to treatment of the priests.  This included the two credibly accused priests currently receiving vested pension benefits from the Benefit Plan (the "Priests").  The Priests are retired and, aside from the benefits under the Benefit Plan, do not receive any other compensation from the Diocese.  The Priests are not involved in active ministry.

15.     Treatment could have included laicization and/or rendering the Priests ineligible for benefits.  However, based on Canon Law, the Holy See determined that the Priests could not be laicized or their benefits terminated.  The Priests remain retired, ordained priests of the Diocese.

16.     While the Diocese agrees that the accusations against the Priests are credible, the Priests have otherwise not been criminally charged or been the subject of civil or criminal judgments related to the allegations of sexual abuse.

17.     The Priests receive a collective total of $3,900 per month in pension benefits from the Benefit Plan.

Dated: February 18, 2025

John J. McDermott
Bishop of the Roman Catholic
Diocese of Burlington, Vermont

Sworn and subscribed to before me, a notary public for the State of Vermont this

eighteenth day of February, 2025.

Notary Public
Exp. Date:

## **EXHIBIT A**

# Priests' Benefit Fund Retirement Plan

### Amended and Restated
### Effective July 1, 2005

FUTURE PLANNING ASSOCIATES, INC.

EMPLOYEE AND EXECUTIVE BENEFIT CONSULTANTS

600 Blair Park Road, Suite 331
P.O. Box 905
Williston, VT 05495-0905
Tel 802-878-6601  Fax 802-878-9455
www.futureplanningassoc.com

# TABLE OF CONTENTS

### ARTICLE I
### DEFINITIONS

### ARTICLE II
### ADMINISTRATION

| | | |
|---|---|---|
| 2.1 | POWERS AND RESPONSIBILITIES OF THE EMPLOYER | 7 |
| 2.2 | DESIGNATION OF ADMINISTRATIVE AUTHORITY | 7 |
| 2.3 | POWERS AND DUTIES OF THE ADMINISTRATOR | 8 |
| 2.4 | RECORDS AND REPORTS | 9 |
| 2.5 | APPOINTMENT OF ADVISERS | 9 |
| 2.6 | PAYMENT OF EXPENSES | 9 |
| 2.7 | CLAIMS PROCEDURE | 9 |
| 2.8 | CLAIMS REVIEW PROCEDURE | 10 |

### ARTICLE III
### ELIGIBILITY

| | | |
|---|---|---|
| 3.1 | CONDITIONS OF ELIGIBILITY | 10 |
| 3.2 | EFFECTIVE DATE OF PARTICIPATION | 10 |
| 3.3 | DETERMINATION OF ELIGIBILITY | 11 |
| 3.4 | TERMINATION OF ELIGIBILITY | 11 |
| 3.5 | REHIRED EMPLOYEES AND BREAKS IN SERVICE | 11 |
| 3.6 | ELECTION NOT TO PARTICIPATE | 11 |

### ARTICLE IV
### CONTRIBUTION AND VALUATION

| | | |
|---|---|---|
| 4.1 | PAYMENT OF CONTRIBUTIONS | 11 |
| 4.2 | ACTUARIAL METHODS | 11 |
| 4.3 | QUALIFIED MILITARY SERVICE | 12 |

### ARTICLE V
### BENEFITS

| | | |
|---|---|---|
| 5.1 | RETIREMENT BENEFITS | 12 |
| 5.2 | PAYMENT OF RETIREMENT BENEFITS | 13 |
| 5.3 | DISABILITY RETIREMENT BENEFITS | 13 |
| 5.4 | DEATH BENEFITS | 13 |

Confidential

5.5     TERMINATION OF EMPLOYMENT BEFORE RETIREMENT ....................................13

5.6     DISTRIBUTION OF BENEFITS .................................................................................14

5.7     DISTRIBUTION OF BENEFITS UPON DEATH ..........................................................14

5.8     TIME OF SEGREGATION OR DISTRIBUTION .........................................................15

5.9     LOCATION OF PARTICIPANT UNKNOWN ...............................................................15

5.11    QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION .............................15

### ARTICLE VI
### CODE SECTION 415 LIMITATIONS

6.1     ANNUAL BENEFIT .........................................................................................................15

6.2     MAXIMUM ANNUAL BENEFIT ...................................................................................15

6.3     ADJUSTMENTS TO ANNUAL BENEFIT AND LIMITATIONS..............................17

6.4     ANNUAL BENEFIT NOT IN EXCESS OF $10,000 ....................................................18

6.5     PARTICIPATION OR SERVICE REDUCTIONS ..........................................................18

### ARTICLE VII
### PLAN AMENDMENT

7.1     AMENDMENT ..................................................................................................................19

### ARTICLE VIII
### PLAN TERMINATION

8.1     TERMINATION .................................................................................................................19

8.2     LIMITATION OF BENEFITS ON PLAN TERMINATION ...........................................20

### ARTICLE IX
### MISCELLANEOUS

9.1     PARTICIPANT'S RIGHTS .................................................................................................20

9.2     ALIENATION ....................................................................................................................20

9.3     CONSTRUCTION OF PLAN ............................................................................................21

9.4     GENDER AND NUMBER .................................................................................................21

9.5     LEGAL ACTION ...............................................................................................................21

9.6     PROHIBITION AGAINST DIVERSION OF FUNDS .....................................................21

9.7     EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE...........................................22

9.8     INSURER'S PROTECTIVE CLAUSE ..............................................................................22

9.9     RECEIPT AND RELEASE FOR PAYMENTS .................................................................22

9.10    ACTION BY THE EMPLOYER .......................................................................................22

Confidential

9.11   NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY ......................22

9.12   HEADINGS..........................................................................................................23

9.13   UNIFORMITY .....................................................................................................23

Confidential

DEB000044_0005

# Priests' Benefit Fund Retirement Plan

THIS PLAN, hereby adopted this _16th_ day of _February 2006_, by The Roman Catholic Diocese of Burlington, Inc. (herein referred to as the "Employer").

## WITNESSETH:

WHEREAS, the Employer heretofore established a Pension Plan effective July 1, 1952, (hereinafter called the "Effective Date") known as the Priests' Benefit Fund Retirement Plan (herein referred to as the "Plan") in recognition of the contribution made to its successful operation by its employees and for the exclusive benefit of its eligible employees; and

WHEREAS, under the terms of the Plan, the Employer has the ability to amend the Plan, provided the Trustee joins in such amendment if the provisions of the Plan affecting the Trustee are amended;

NOW, THEREFORE, effective July 1, 2005, except as otherwise provided, the Employer in accordance with the provisions of the Plan pertaining to amendments thereof, hereby amends the Plan in its entirety and restates the Plan to provide as follows:

## ARTICLE I
## DEFINITIONS

1.1    "Accrued Benefit" means the retirement benefit a Participant would receive at Normal Retirement Date based on the retirement benefit amount set forth in Section 5.1 of the Plan.

1.2    "Act" means the Employee Retirement Income Security Act of 1974, as it may be amended from time to time.

1.3    "Actuarial Equivalent" means a form of benefit differing in time, period, or manner of payment from a specific benefit provided under the Plan but having the same value when computed using Pre-Retirement Table: 1994 Group Annuity Reserving Unisex Projected to 2005 using Scale AA ; Post-Retirement Table: 1994 Group Annuity Reserving Unisex Projected to 2005 using Scale AA and Pre-Retirement Interest: 6%; Post-Retirement Interest: 6%.

Notwithstanding the foregoing, the mortality table and the interest rate for the purposes of determining an Actuarial Equivalent amount (other than nondecreasing life annuities payable for a period not less than the life of a Participant) shall be the mortality table and the interest rates specified above or the "Applicable Mortality Table" and the "Applicable Interest Rate" described below, whichever produces the greater benefit:

(a)    The "Applicable Mortality Table" means the table prescribed by the Secretary of the Treasury. Such table shall be based on the prevailing commissioner's standard table (described in Code Section 807(d)(5)(A)) used to determine reserves for group annuity contracts issued on the date as of which present value is being determined (without regard to any other subparagraph of Code Section 807(d)(5)).

1

DEB000044_0006

(b)     The "Applicable Interest Rate" means the annual rate of interest on 30-year Treasury securities determined as of the first day of the Plan Year during which the Annuity Starting Date occurs. However, except as provided in Regulations, if a Plan amendment (including this amendment and restatement) changes the time for determining the "Applicable Interest Rate" (including an indirect change as a result of a change in the Plan Year), any distribution for which the Annuity Starting Date occurs in the one-year period commencing at the time the Plan amendment is effective (if the amendment is effective on or after the adoption date) must use the interest rate as provided under the terms of the Plan after the effective date of the amendment, determined at either the date for determining the interest rate before the amendment or the date for determining the interest rate after the amendment, whichever results in the larger distribution. If the Plan amendment is adopted retroactively (that is, the amendment is effective prior to the adoption date), the Plan must use the interest rate determination date resulting in the larger distribution for the period beginning with the effective date and ending one year after the adoption date.

In the event this Section is amended, the Actuarial Equivalent of a Participant's Accrued Benefit on or after the date of change shall be determined (unless otherwise permitted by law or Regulation) as the greater of (1) the Actuarial Equivalent of the Accrued Benefit as of the date of change computed on the old basis, or (2) the Actuarial Equivalent of the total Accrued Benefit computed on the new basis.

1.4     "Administrator" means the Employer unless another person or entity has been designated by the Employer pursuant to Section 2.2 to administer the Plan on behalf of the Employer.

1.5     "Affiliated Employer" means any corporation which is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Regulations under Code Section 414(o).

1.6     "Anniversary Date" means July 1.

1.7     "Annuity Starting Date" means, with respect to any Participant, the first day of the first period for which an amount is paid as an annuity.

1.8     "Bishop" means the Bishop of the Roman Catholic Diocese of Burlington, Inc.

1.9     "Code" means the Internal Revenue Code of 1986, as amended or replaced from time to time.

1.10     "Contract" or "Policy" means any life insurance policy, retirement income policy or annuity contract (group or individual) issued pursuant to the terms of the Plan. In the event of any conflict between the terms of this Plan and the terms of any contract purchased hereunder, the Plan provisions shall control.

2

1.11    "Earliest Retirement Age" means the earliest date on which, under the Plan, the Participant could elect to receive retirement benefits.

1.12    "Early Retirement Date" means the first day of the month (prior to the Normal Retirement Date) coinciding with or following the date on which a Participant or Former Participant attains age 60 and has completed at least 20 Years of Service with the Employer (Early Retirement Age). A Participant shall become fully Vested upon satisfying this requirement if still employed at Early Retirement Age.

1.13    "Eligible Employee" means any Employee who is an Ordained priest and who has not attained age 70 by his participation date.  A priest who becomes disassociated with the Employer shall not be an Eligible Employee.

Employees classified by the Employer as independent contractors who are subsequently determined by the Internal Revenue Service to be Employees shall not be Eligible Employees. .

1.14    "Employee" means any person who is employed by the Employer or Affiliated Employer, and excludes any person who is employed as an independent contractor. Employee shall include Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and such Leased Employees do not constitute more than 20% of the recipient's non-highly compensated work force.

1.15    "Employer" means The Roman Catholic Diocese of Burlington, Inc. and any successor which shall maintain this Plan; and any predecessor which has maintained this Plan. The Employer is a non-profit corporation, with principal offices in the State of Vermont.

1.16    "Fiduciary" means any person who (a) exercises any discretionary authority or discretionary control respecting management of the Plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the Plan or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of the Plan.

1.17    "Fiscal Year" means the Employer's accounting year of 12 months commencing on July 1 of each year and ending the following June 30.

1.18    "Former Participant" means a person who has been a Participant, but who has ceased to be a Participant for any reason.

1.19    "415 Compensation" with respect to any Participant means such Participant's wages as defined in Code Section 3401(a) and all other payments of compensation by the Employer (in the course of the Employer's trade or business) for a Plan Year for which the Employer is required to furnish the Participant a written statement under Code Sections 6041(d), 6051(a)(3) and 6052. "415 Compensation" must be determined without regard to any rules under Code Section 3401(a) that limit the remuneration included in wages based on the nature or

3

location of the employment or the services performed (such as the exception for agricultural labor in Code Section 3401(a)(2)).

For purposes of this Section, the determination of "415 Compensation" shall include any elective deferral (as defined in Code Section 402(g)(3)), and any amount which is contributed or deferred by the Employer at the election of the Participant and which is not includible in the gross income of the Participant by reason of Code Sections 125, 132(f)(4) or 457.

1.20    "Highly Compensated Employee" means an Employee described in Code Section 414(q) and the Regulations thereunder, and generally means any Employee who:

(a)      was a "five percent owner" of the Employer at any time during the "determination year" or "look-back year." "Five percent owner" means any person who owns (or is considered as owning within the meaning of Code Section 318) more than five percent of the outstanding stock of the Employer or stock possessing more than five percent of the total combined voting power of all stock of the Employer or, in the case of an unincorporated business, any person who owns more than five percent of the capital or profits interest in the Employer. In determining percentage ownership hereunder, employers that would otherwise be aggregated under Code Sections 414(b), (c), (m) and (o) shall be treated as separate employers; or

(b)      for the "look-back year" had "415 Compensation" from the Employer in excess of $80,000. The $80,000 amount is adjusted at the same time and in the same manner as under Code Section 415(d), except that the base period is the calendar quarter ending September 30, 1996.

The "determination year" means the Plan Year for which testing is being performed, and the "look-back year" means the immediately preceding twelve (12) month period.

A highly compensated former Employee is based on the rules applicable to determining Highly Compensated Employee status as in effect for the "determination year," in accordance with Regulation 1.414(q)-1T, A-4 and IRS Notice 97-45 (or any superseding guidance).

In determining who is a Highly Compensated Employee, Employees who are non-resident aliens and who received no earned income (within the meaning of Code Section 911(d)(2)) from the Employer constituting United States source income within the meaning of Code Section 861(a)(3) shall not be treated as Employees. Additionally, all Affiliated Employers shall be taken into account as a single employer and Leased Employees within the meaning of Code Sections 414(n)(2) and 414(o)(2) shall be considered Employees unless such Leased Employees are covered by a plan described in Code Section 414(n)(5) and are not covered in any qualified plan maintained by the Employer. The exclusion of Leased Employees for this purpose shall be applied on a uniform and consistent basis for all of the Employer's retirement plans. Highly Compensated Former Employees shall be treated as Highly Compensated Employees without regard to whether they performed services during the "determination year."

4

Confidential

1.21 "Highly Compensated Participant" means any Highly Compensated Employee who is eligible to participate in the component of the Plan being tested.

1.22 "Investment Manager" means an entity that (a) has the power to manage, acquire, or dispose of Plan assets and (b) acknowledges fiduciary responsibility to the Plan in writing. Such entity must be a person, firm, or corporation registered as an investment adviser under the Investment Advisers Act of 1940, a bank, or an insurance company.

1.23 "Late Retirement Date" means the first day of the month coinciding with or next following a Participant's actual Retirement Date after having reached Normal Retirement Date.

1.24 "Leased Employee" means any person (other than an Employee of the recipient Employer) who pursuant to an agreement between the recipient Employer and any other person or entity ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Code Section 414(n)(6)) on a substantially full time basis for a period of at least one year, and such services are performed under primary direction or control by the recipient Employer. Contributions or benefits provided a Leased Employee by the leasing organization which are attributable to services performed for the recipient Employer shall be treated as provided by the recipient Employer. Furthermore, Compensation for a Leased Employee shall only include Compensation from the leasing organization that is attributable to services performed for the recipient Employer. A Leased Employee shall not be considered an Employee of the recipient Employer:

(a) if such employee is covered by a money purchase pension plan providing:

(1) a nonintegrated employer contribution rate of at least 10% of compensation, as defined in Code Section 415(c)(3);

(2) immediate participation;

(3) full and immediate vesting; and

(b) if Leased Employees do not constitute more than 20% of the recipient Employer's nonhighly compensated work force.

1.25 "Non-Highly Compensated Participant" means any Participant who is not a Highly Compensated Employee.

1.26 "Normal Retirement Age" means the Participant's 70th birthday, or the Participant's completion of 20 Years of Service, if later. A Participant shall become fully Vested in the Participant's Normal Retirement Benefit upon attaining Normal Retirement Age.

1.27 "Normal Retirement Date" means the first day of the month coinciding with or next following the Participant's Normal Retirement Age.

1.28 "Participant" means any Eligible Employee who participates in the Plan and has not for any reason become ineligible to participate further in the Plan.

5

DEB000044_0010

1.29   "Plan" means this instrument, including all amendments thereto.

1.30   "Plan Year" means the Plan's accounting year of twelve (12) months commencing on July 1 of each year and ending the following June 30.

1.31   "Regulation" means the Income Tax Regulations as promulgated by the Secretary of the Treasury or a delegate of the Secretary of the Treasury, and as amended from time to time.

1.32   "Retired Participant" means a person who has been a Participant, but who has become entitled to retirement benefits under the Plan.

1.33   "Retirement Date" means the date as of which a Participant retires for reasons other than Total and Permanent Disability, whether such retirement occurs on a Participant's Normal Retirement Date, Early or Late Retirement Date (see Section 5.1).

1.34   "Social Security Retirement Age" means the age used as the retirement age under Section 216(l) of the Social Security Act, except that such section shall be applied without regard to the age increase factor and as if the early retirement age under Section 216(l)(2) of such Act were 62.

1.35   "Terminated Participant" means a person who has been a Participant, but whose employment has been terminated other than by death, Total and Permanent Disability or retirement.

1.36   "Total and Permanent Disability" means a physical or mental condition of a Participant resulting from bodily injury, disease, or mental disorder which renders such Participant incapable of continuing any gainful occupation and which condition constitutes total disability under the federal Social Security Acts. The Employer may require proof of continued disability. Such proof may be required periodically, but no more frequently than once every six months. The term Total and Permanent Disability does not include disability resulting from self-inflicted injury, habitual use or narcotics or alcohol. Further, this term does not include disability incurred in the Armed Forces of the United States for which a service connected government disability is payable; nor does it include incapacity which occurred while engaged in or resulting from a felonious enterprise.

1.37   "Trustee" means the person or entity named as trustee herein or in any separate trust forming a part of this Plan, and any successors.

1.38   "Trust Fund" means the assets of the Plan and Trust as the same shall exist from time to time.

1.39   "Vested" means the portion of a Participant's benefits under the Plan that are nonforfeitable.

1.40   "Year of Service" means the computation period of twelve (12) consecutive months during which an Employee has uninterupted employment with the Employer since the Participant's last date of employment.

6

Confidential

DEB000044_0011

A period of absence from service shall not be considered an interuption in service if such absence is on account of:

(a)     absence with the consent of the Bishop during any period not in excess of one year, except that the Bishop may extend the period of leave;

(b)     absence due to injury or disease; or

(c)     absence in the service of the Armed Forces of the United States, provided the Participant subsequently returns to service of the Employer.

ARTICLE II
ADMINISTRATION

2.1    POWERS AND RESPONSIBILITIES OF THE EMPLOYER

(a)     In addition to the general powers and responsibilities otherwise provided for in this Plan, the Employer shall be empowered to appoint and remove the Trustee and the Administrator from time to time as it deems necessary for the proper administration of the Plan to ensure that the Plan is being operated for the exclusive benefit of the Participants and their Beneficiaries in accordance with relevant terms of the Plan, the Code, and the Act. The Employer may appoint counsel, specialists, advisers, agents (including any nonfiduciary agent) and other persons as the Employer deems necessary or desirable in connection with the exercise of its fiduciary duties under this Plan. The Employer may compensate such agents or advisers from the assets of the Plan as fiduciary expenses (but not including any business (settlor) expenses of the Employer), to the extent not paid by the Employer.

(b)     The Employer shall establish a "funding policy and method," i.e., it shall determine whether the Plan has a short run need for liquidity (e.g., to pay benefits) or whether liquidity is a long run goal and investment growth (and stability of same) is a more current need, or shall appoint a qualified person to do so. The Employer or its delegate shall communicate such needs and goals to the Trustee, who shall coordinate such Plan needs with its investment policy. The communication of such a "funding policy and method" shall not, however, constitute a directive to the Trustee as to the investment of the Trust Funds. Such "funding policy and method" shall be consistent with the objectives of this Plan and with relevant requirements of Title I of the Act.

(c)     The Employer shall periodically review the performance of any Fiduciary or other person to whom duties have been delegated or allocated by it under the provisions of this Plan or pursuant to procedures established hereunder. This requirement may be satisfied by formal periodic review by the Employer or by a qualified person specifically designated by the Employer, through day-to-day conduct and evaluation, or through other appropriate ways.

2.2    DESIGNATION OF ADMINISTRATIVE AUTHORITY

The Employer shall be the Administrator. The Employer may appoint any person, including, but not limited to, the Employees of the Employer, to perform the duties of the Administrator. Any person so appointed shall signify acceptance by filing written acceptance

7

DEB000044_0012

with the Employer. Upon the resignation or removal of any individual performing the duties of the Administrator, the Employer may designate a successor.

2.3    POWERS AND DUTIES OF THE ADMINISTRATOR

The primary responsibility of the Administrator is to administer the Plan for the exclusive benefit of the Participants and their Beneficiaries, subject to the specific terms of the Plan. The Administrator shall administer the Plan in accordance with its terms and shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan. Any such determination by the Administrator shall be conclusive and binding upon all persons. The Administrator may establish procedures, correct any defect, supply any information, or reconcile any inconsistency in such manner and to such extent as shall be deemed necessary or advisable to carry out the purpose of the Plan; provided, however, that any procedure, discretionary act, interpretation or construction shall be done in a nondiscriminatory manner based upon uniform principles consistently applied and shall be consistent with the intent that the Plan shall continue to be deemed a non-electing church plan under the terms of the Code, and shall comply with the terms of the Act and all regulations issued pursuant thereto. The Administrator shall have all powers necessary or appropriate to accomplish the Administrator's duties under the Plan.

The Administrator shall be charged with the duties of the general administration of the Plan as set forth under the terms of the Plan, including, but not limited to, the following:

(a)    the discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan;

(b)    to compute, certify, and direct the Trustee with respect to the amount and the kind of benefits to which any Participant shall be entitled hereunder;

(c)    to authorize and direct the Trustee with respect to all discretionary or otherwise directed disbursements from the Trust;

(d)    to maintain all necessary records for the administration of the Plan;

(e)    to interpret the provisions of the Plan and to make and publish such rules for regulation of the Plan as are consistent with the terms hereof;

(f)    to determine the size and type of any Contract to be purchased from any insurer and to designate the insurer from which such Contract shall be purchased. All Policies shall be issued on a uniform basis as of each Anniversary Date with respect to all Participants under similar circumstances;

(g)    to compute and certify to the Employer and to the Trustee from time to time the sums of money necessary or desirable to be contributed to the Plan;

8

Confidential

(h)     to consult with the Employer and the Trustee regarding the short and long-term liquidity needs of the Plan in order that the Trustee can exercise any investment discretion in a manner designed to accomplish specific objectives;

(i)     to determine the validity of, and take appropriate action with respect to, any qualified domestic relations order received by it; and

(j)     to assist any Participant regarding the Participant's rights, benefits, or elections available under the Plan,

## 2.4     RECORDS AND REPORTS

The Administrator shall keep a record of all actions taken and shall keep all other books of account, records, policies, and other data that may be necessary for proper administration of the Plan and shall be responsible for supplying all information and reports to the Internal Revenue Service, Department of Labor, Participants, Beneficiaries and others as required by law.

## 2.5     APPOINTMENT OF ADVISERS

The Priests' Benefit Board of Advisors shall be the primary advisers for the Plan. The Administrator or the Trustee, with the consent of the Priests' Benefit Board of Advisors, may appoint counsel, specialists, advisers, agents (including nonfiduciary agents) and other persons as the Administrator or the Trustee deems necessary or desirable in connection with the administration of this Plan, including but not limited to agents and advisers to assist with the administration and management of the Plan, and thereby to provide, among such other duties as the Administrator may appoint, assistance with maintaining Plan records and the providing of investment information to the Plan's investment fiduciaries.

## 2.6     PAYMENT OF EXPENSES

All expenses of administration may be paid out of the Trust Fund unless paid by the Employer. Such expenses shall include any expenses incident to the functioning of the Administrator, or any person or persons retained or appointed by any named Fiduciary incident to the exercise of their duties under the Plan, including, but not limited to, fees of accountants, counsel, Investment Managers, and other specialists and their agents, and other costs of administering the Plan. Until paid, the expenses shall constitute a liability of the Trust Fund.

## 2.7     CLAIMS PROCEDURE

Claims for benefits under the Plan may be filed in writing with the Administrator. Written notice of the disposition of a claim shall be furnished to the claimant within ninety (90) days after the application is filed, or such period as is required by applicable law or Department of Labor regulation. In the event the claim is denied, the reasons for the denial shall be specifically set forth in the notice in language calculated to be understood by the claimant, pertinent provisions of the Plan shall be cited, and, where appropriate, an explanation as to how the claimant can perfect the claim will be provided. In addition, the claimant shall be furnished with an explanation of the Plan's claims review procedure.

9

2.8     CLAIMS REVIEW PROCEDURE

        Any Employee or former Employee who has been denied a benefit by a decision of the Administrator pursuant to Section 2.7 shall be entitled to request the Administrator to give further consideration to a claim by filing with the Administrator a written request for a hearing. Such request, together with a written statement of the reasons why the claimant believes the claim should be allowed, shall be filed with the Administrator no later than sixty (60) days after receipt of the written notification provided for in Section 2.7. The Administrator shall then conduct a hearing within the next sixty (60) days, at which the claimant may be represented by an attorney or any other representative of such claimant's choosing and expense and at which the claimant shall have an opportunity to submit written and oral evidence and arguments in support of the claim. At the hearing (or prior thereto upon five (5) business days written notice to the Administrator) the claimant or the claimant's representative shall have an opportunity to review all documents in the possession of the Administrator which are pertinent to the claim at issue and its disallowance. Either the claimant or the Administrator may cause a court reporter to attend the hearing and record the proceedings. In such event, a complete written transcript of the proceedings shall be furnished to both parties by the court reporter. The full expense of any such court reporter and such transcripts shall be borne by the party causing the court reporter to attend the hearing. A final decision as to the allowance of the claim shall be made by the Administrator within sixty (60) days of receipt of the appeal (unless there has been an extension of sixty (60) days due to special circumstances, provided the delay and the special circumstances occasioning it are communicated to the claimant within the sixty (60) day period). Such communication shall be written in a manner calculated to be understood by the claimant and shall include specific reasons for the decision and specific references to the pertinent Plan provisions on which the decision is based.

ARTICLE III<br>ELIGIBILITY

3.1     CONDITIONS OF ELIGIBILITY

        Any Eligible Employee shall be eligible to participate hereunder on the date of such Employee's ordination. However, any Employee who was a Participant in the Plan prior to the effective date of this amendment and restatement shall continue to participate in the Plan.

3.2     EFFECTIVE DATE OF PARTICIPATION

        An Eligible Employee shall become a Participant effective as of the first day of the month coinciding with or next following the date on which such Employee met the eligibility requirements of Section 3.1, provided said Employee was still employed as of such date.

        If an Employee, who has satisfied the Plan's eligibility requirements and would otherwise have become a Participant, shall go from a classification of a noneligible Employee to an Eligible Employee, such Employee shall become a Participant on the date such Employee becomes an Eligible Employee.

10

3.3  DETERMINATION OF ELIGIBILITY

The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan and the Act. Such determination shall be subject to review pursuant to Section 2.8.

3.4  TERMINATION OF ELIGIBILITY

In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Former Participant shall not be eligible for benefits under this Plan unless such Former Participant again meets the requirements to be an Eligible Employee.

3.5  REHIRED EMPLOYEES AND BREAKS IN SERVICE

(a)  If any Participant becomes a Former Participant due to severance from employment with the Employer and is reemployed by the Employer, the Former Participant shall become a Participant as of the reemployment date.

(b)  If any Participant becomes a Former Participant due to severance of employment with the Employer and again becomes a Participant, such renewed participation shall not result in duplication of benefits.

3.6  ELECTION NOT TO PARTICIPATE

An Employee may, subject to the approval of the Employer, elect voluntarily not to participate in the Plan. The election not to participate must be irrevocable and communicated to the Employer, in writing, within a reasonable period of time before the beginning of the first Plan Year.

ARTICLE IV
CONTRIBUTION AND VALUATION

4.1  PAYMENT OF CONTRIBUTIONS

No contribution shall be required under the Plan from any Participant. The Employer shall pay to the Trustee from time to time such amounts in cash as the Administrator and Employer shall determine to be necessary to provide the benefits under the Plan determined by the application of accepted actuarial methods and assumptions. The method of funding shall be consistent with Plan objectives.

4.2  ACTUARIAL METHODS

In establishing the liabilities under the Plan and contributions thereto, the enrolled actuary will use such methods and assumptions as will reasonably reflect the cost of the benefits. The Plan assets are to be valued on the last day of the Plan Year (or on any other date determined by the Administrator) using any reasonable method of valuation that takes into account fair market value pursuant to Regulations. There must be an actuarial valuation of the Plan at least once every year.

11

Confidential

DEB000044_0016

4.3   QUALIFIED MILITARY SERVICE

Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service will be provided in accordance with Code Section 414(u).

ARTICLE V
BENEFITS

5.1   RETIREMENT BENEFITS

(a)   Subject to approval by the Bishop, the amount of monthly retirement benefit to be provided for each Participant who retires on the Participant's Normal Retirement Date with twenty (20) or more Years of Service shall be equal to the Participant's Accrued Benefit (herein called the Participant's Normal Retirement Benefit). A Participant's Accrued Benefit is equal to $1,000 per month for retired priests and $1,500 per month for retired bishops. On January 1, 2006 a Participant's Accrued Benefit will be equal to $1,100 per month for retired priests and $1,650 per month for retired bishops.

Such benefit shall be reduced by the monthly pension of any other retirement plan benefit for which the Employer contributes on behalf of such Participant (except Social Security). Such benefit shall be reduced by benefits payable to a Participant in the Plan from a retirement plan of another employer. If the benefits of this Plan exceed the benefits of the other plan, then the benefit payable from this Plan will be offset by the amount payable from the other plan. If the benefits of the other plan exceed the benefit payable from this Plan, no benefit will be paid from this Plan.

(b)   With the consent of the Bishop, a Participant may elect to retire on an Early Retirement Date. In the event that a Participant makes such an election, such Participant shall be entitled to receive an Early Retirement Benefit equal to the Participant's Accrued Benefit which would be payable at the Participant's Normal Retirement Date.

(c)   The Normal Retirement Benefit payable to a Participant pursuant to this Section 5.1 shall be a monthly pension commencing on the Participant's Retirement Date and continuing for life.

(d)   At the request of a Participant, the Participant may be continued in employment beyond Normal Retirement Date. In such event, retirement benefits shall commence as if such Participant had retired at his Normal Retirement Date. Except, however, with the annual consent of the Bishop, a Participant may continue in employment beyond Normal Retirement Date and elect to defer retirement to a Late Retirement Date which may be the first day of any month within five (5) years after his Normal Retirement Date, but not beyond the Participant's attainment of age 75; in such case, payment of benefits shall be deferred until the Participant's actual retirement date.

12

DEB000044_0017

5.2     PAYMENT OF RETIREMENT BENEFITS

When a Participant retires or commences benefits while still employed following Normal Retirement Date, the Administrator shall immediately take pursuant to the Plan all necessary steps and execute all required documents to cause the payment of the Participant's Accrued Benefit pursuant to the Plan.

5.3     DISABILITY RETIREMENT BENEFITS

(a)     If a Participant becomes Totally and Permanently Disabled pursuant to Section 1.36 prior to retirement or separation from service and after the Effective Date of the Plan, such Participant has attained age 60 and completed twenty (20) Years of Service, and such condition continues for a period of six (6) consecutive months, then said disabled Participant shall be entitled to receive the benefits payable pursuant to Section 5.1(b). In the event of a Participant's Total and Permanent Disability, the Administrator shall direct the Trustee to commence payment of the benefits payable hereunder pursuant to the provisions of Sections 5.6 and 5.8 as though the Participant had retired.

(b)     Disability Retirement Benefits will continue during the period of the Participant's Total and Permanent Disability and will terminate with the last monthly payment due before the earliest of the following dates:

(1)     the Participant's date of death;
(2)     the date the Participant no longer qualifies as Totally and Permanently Disabled; or
(3)     the first day of the month following the Participant's Normal Retirement Date.

If such Disability Retirement Benefit ceases due to (3) above, payment of the Normal Retirement Benefit will commence on such date in the same amount as the Disability Retirement Benefit.

5.4     DEATH BENEFITS

No benefits shall be payable following death of the Participant.

5.5     TERMINATION OF EMPLOYMENT BEFORE RETIREMENT

An Eligible Employee who leaves the service of the Employer for reasons other than
(1)     Normal, Early or Late Retirement,
(2)     Total and Permanent Disability,
(3)     approved leave of absence up to one year (or such longer period as approved by the Bishop)
(4)     absence due to injury or disease, or
(5)     service in the Armed Forces of the United States
shall be ineligible for any benefit from this Plan.

13

Confidential

DEB000044_0018

5.6    DISTRIBUTION OF BENEFITS

(a)    The Participant's Accrued Benefit shall be payable as a monthly pension over the life of the Participant.

(b)    Notwithstanding any provision in the Plan to the contrary, the distribution of a Participant's benefits, whether under the Plan or through the purchase of an annuity contract, shall be made in accordance with the following requirements and shall otherwise comply with Code Section 401(a)(9) and the Regulations thereunder (including Regulation 1.401(a)(9)-2), the provisions of which are incorporated herein by reference:

(1)    A Participant's benefits must begin to be distributed not later than April 1st of the calendar year following the later of (i) the calendar year in which the Participant attains age 70 1/2 or (ii) the calendar year in which the Participant retires. Such distributions shall be equal to or greater than any required distribution and must be made over the life of the Participant in accordance with Regulations.

(2)    Distributions to a Participant shall only be made in accordance with the incidental death benefit requirements of Code Section 401(a)(9)(G) and the Regulations thereunder.

With respect to distributions under the Plan made for calendar years beginning on or after January 1, 2002, the Plan will apply the minimum distribution requirements of Code Section 401(a)(9) in accordance with the Regulations under Code Section 401(a)(9) that were proposed on January 17, 2001, notwithstanding any provision of the Plan to the contrary. This amendment shall continue in effect until the end of the last calendar year beginning before the effective date of final Regulations under Code Section 401(a)(9) or such other date specified in guidance published by the Internal Revenue Service.

(c)    For purposes of this Section, the life expectancy of a Participant shall not be redetermined in accordance with Code Section 401(a)(9)(D). Life expectancy shall be computed using the return multiples in Table V of Regulation 1.72-9.

(d)    All annuity Contracts under this Plan shall be non-transferable when distributed. Furthermore, the terms of any annuity Contract purchased and distributed to a Participant shall comply with all of the requirements of the Plan.

5.7    DISTRIBUTION OF BENEFITS UPON DEATH

No benefits shall be payable following death of a Participant and any monthly benefit payments shall cease as of the last payment due immediately preceding the Participant's death.

14

DEB000044_0019

5.8   TIME OF SEGREGATION OR DISTRIBUTION

Except as limited by Section 5.6, whenever the Trustee is to make a distribution or to commence a series of payments the distribution or series of payments may be made or begun on such date or as soon thereafter as is practicable. However, unless a Former Participant elects in writing to defer the receipt of benefits (such election may not result in a death benefit that is more than incidental), the payment of benefits shall begin not later than: (a) the date on which the Participant attains the earlier of age 75 or (b) the fifth (5th) year following the Participant's Normal Retirement Date.

5.9   LOCATION OF PARTICIPANT UNKNOWN

In the event that all, or any portion, of the distribution payable to a Participant hereunder shall, at the later of the Participant's attainment of age 62 or Normal Retirement Age, remain unpaid solely by reason of the inability of the Administrator, after sending a registered letter, return receipt requested, to the last known address, and after further diligent effort, to ascertain the whereabouts of such Participant, the amount so distributable shall be forfeited and shall be used to reduce the cost of the Plan.

5.10   QUALIFIED DOMESTIC RELATIONS ORDER DISTRIBUTION

All rights and benefits, including elections, provided to a Participant in this Plan shall be subject to the rights afforded to any "alternate payee" under a "qualified domestic relations order." Furthermore, a distribution to an "alternate payee" shall be permitted if such distribution is authorized by a "qualified domestic relations order," even if the affected Participant has not separated from service and has not reached the Earliest Retirement Age. For the purposes of this Section, "alternate payee" and "qualified domestic relations order" shall have the meaning set forth under Code Section 414(p).

ARTICLE VI
CODE SECTION 415 LIMITATIONS

6.1   ANNUAL BENEFIT

For purposes of this Article, "annual benefit" means the benefit payable annually under the terms of the Plan (exclusive of any benefit not required to be considered for purposes of applying the limitations of Code Section 415 to the Plan) payable in the form of a straight life annuity with no ancillary benefits.

6.2   MAXIMUM ANNUAL BENEFIT

(a)   Notwithstanding the foregoing and subject to the exceptions below, the maximum "annual benefit" payable to a Participant under this Plan in any "limitation year" shall equal the lesser of: (1) $90,000 payable as a straight life annuity, or (2) one hundred percent (100%) of the Participant's "415 Compensation" averaged over the three consecutive "limitation years" (or actual number of "limitation years" for Employees who have been employed for less than three consecutive "limitation years") during which the Employee had the greatest aggregate "415 Compensation" from the Employer.

15

Confidential
DEB000044_0020

(b)　　For purposes of applying the limitations of Code Section 415, the "limitation year" shall be the Plan Year. All qualified plans maintained by the Employer must use the same "limitation year." If the "limitation year" is amended to a different twelve (12) consecutive month period, the new "limitation year" must begin on a date within the "limitation year" in which the amendment is made.

(c)　　Notwithstanding anything in this Article to the contrary, if the Plan was in existence on May 6, 1986, and had complied at all times with the requirements of Code Section 415, the maximum "annual benefit" for any individual who is a Participant as of the first day of the "limitation year" beginning after December 31, 1986, shall not be less than the "current accrued benefit." "Current accrued benefit" shall mean a Participant's Accrued Benefit under the Plan, determined as if the Participant had separated from service as of the close of the last "limitation year" beginning before January 1, 1987, when expressed as an annual benefit within the meaning of Code Section 415(b)(2). In determining the amount of a Participant's "current accrued benefit," the following shall be disregarded: (1) any change in the terms and conditions of the Plan after May 5, 1986; and (2) any cost of living adjustment occurring after May 5, 1986.

(d)　　The dollar limitation under Code Section 415(b)(1)(A) stated in paragraph (a)(1) above shall be adjusted annually as provided in Code Section 415(d) pursuant to the Regulations. The adjusted limitation is effective as of January 1st of each calendar year and is applicable to "limitation years" ending with or within that calendar year.

(e)　　The limitation stated in paragraph (a)(2) above for Participants who have separated from service with a non-forfeitable right to an Accrued Benefit shall be automatically adjusted by multiplying such limitation by the cost-of-living adjustment factor prescribed by the Secretary of the Treasury under Code Section 415(d) in such manner as the Secretary shall prescribe. The adjusted limitation shall apply to "limitation years" ending with or within the calendar year of the date of the adjustment.

(f)　　For the purpose of this Article, all qualified defined benefit plans (whether terminated or not) ever maintained by the Employer shall be treated as one defined benefit plan.

If a Participant is, or has ever been, a participant in more than one defined benefit plan maintained by the Employer, the sum of the Participant's "annual benefits" from all such plans may not exceed the maximum "annual benefit" of this Section 6.2. Where the Participant's Employer-provided benefits under all defined benefit plans ever maintained by the Employer (determined as of the same age) would exceed the maximum "annual benefit" applicable at that age, the Employer will reduce the rate of accrual in this Plan to the extent necessary so that the total "annual benefit" payable at any time under such plans will not exceed the maximum "annual benefit."

16

DEB000044_0021

(g)     For the purpose of this Article, if the Employer is a member of a controlled group of corporations, trades or businesses under common control (as defined by Code Section 1563(a) or Code Section 414(b) and (c) as modified by Code Section 415(h)) or is a member of an affiliated service group (as defined by Code Section 414(m)), all Employees of such Employers shall be considered to be employed by a single Employer.

(h)     If this is a plan described in Code Section 413(c) (other than a plan described in Code Section 413(f)), then all of the benefits or contributions attributable to a Participant from all of the Employers maintaining this Plan shall be taken into account in applying the limits of this Article with respect to such Participant. Furthermore, in applying the limitations of this Article with respect to such a Participant, the total "415 Compensation" received by the Participant from all of the Employers maintaining the Plan shall be taken into account.

(i)     Notwithstanding anything contained in this Article to the contrary, the limitations, adjustments and other requirements prescribed in this Article shall at all times comply with the provisions of Code Section 415 and the Regulations thereunder.

6.3     ADJUSTMENTS TO ANNUAL BENEFIT AND LIMITATIONS

(a)     If the "annual benefit" begins before the Participant's Social Security Retirement Age, but on or after age 62, the $90,000 limitation shall be reduced by: (1) in the case of a Participant whose Social Security Retirement Age is 65, 5/9 of 1% for each month by which benefits commence before the month in which the Participant attains age 65, or (2) in the case of a Participant whose Social Security Retirement Age is greater than 65, 5/9 of 1% for each of the first 36 months and 5/12 of 1% for each additional month (up to 24) by which benefits commence before the month in which the Participant attains Social Security Retirement Age. If the "annual benefit" begins before age 62, the $90,000 limitation shall be the actuarial equivalent of the Participant's limitation for benefits commencing at age 62, reduced for each month by which benefits commence before the month in which the Participant attains age 62.

In order to determine actuarial equivalence for this purpose, the lesser of the equivalent amount computed using the Plan interest rate and Plan mortality table (or other tabular factor) and the amount computed using five percent (5%) interest and the "Applicable Mortality Table" shall be used. The mortality decrement shall be ignored to the extent that a forfeiture does not occur at death.

(b)     If the "annual benefit" begins after the Participant's Social Security Retirement Age the $90,000 limitation shall be increased so that it is the actuarial equivalent of the $90,000 limitation at the Participant's Social Security Retirement Age. In order to determine actuarial equivalence for this purpose, the lesser of the equivalent amount computed using the Plan interest rate and Plan mortality table (or other tabular factor) used for actuarial equivalence for late retirement benefits under the Plan and the equivalent annual amount computed using five percent

17

Confidential

(5%) and the "Applicable Mortality Table" shall be used. The mortality decrement shall be ignored to the extent that a forfeiture does not occur at death.

(c)     For purposes of adjusting the "annual benefit" to a straight life annuity, the equivalent "annual benefit" shall be the greater of the equivalent "annual benefit" computed using the Plan interest rate and Plan mortality table (or other tabular factor) and the equivalent "annual benefit" computed using five percent (5%) interest rate assumption and the "Applicable Mortality Table." If the "annual benefit" is paid in a form other than a nondecreasing life annuity payable for a period not less than the life of a Participant, the "Applicable Interest Rate" shall be substituted for five percent (5%) in the preceding sentence.

(d)     For purposes of Sections 6.1, 6.3(a) and 6.3(b), no adjustments under Code Section 415(d) shall be taken into account before the "limitation year" for which such adjustment first takes effect.

(e)     For purposes of Section 6.1, no actuarial adjustment to the benefit is required for (1) the value of a qualified joint and survivor annuity, (2) benefits that are not directly related to retirement benefits (such as a qualified disability benefit, pre-retirement death benefits, and post-retirement medical benefits), and (3) the value of post-retirement cost-of-living increases made in accordance with Code Section 415(d) and Regulation 1.415-3(c)(2)(iii). The "annual benefit" does not include any benefits attributable to Employee contributions or rollover contributions, or the assets transferred from a qualified plan that was not maintained by the Employer.

## 6.4     ANNUAL BENEFIT NOT IN EXCESS OF $10,000

This Plan may pay an "annual benefit" to any Participant in excess of the Participant's maximum "annual benefit" if the "annual benefit" derived from Employer contributions under this Plan and all other defined benefit plans maintained by the Employer does not in the aggregate exceed $10,000 for the "limitation year" or for any prior "limitation year" and the Employer has not at any time maintained a defined contribution plan, a welfare benefit fund under which amounts attributable to post-retirement medical benefits are allocated to separate accounts of key employees (as defined in Code Section 419(A)(d)(3)), or an individual medical account in which the Participant participated. For purposes of this paragraph, if this Plan provides for voluntary or mandatory Employee contributions, such contributions will not be considered a separate defined contribution plan maintained by the Employer.

## 6.5     PARTICIPATION OR SERVICE REDUCTIONS

If a Participant has less than ten (10) years of participation in the Plan at the time the Participant begins to receive benefits under the Plan, the limitations in Sections 6.2(a)(1) and 6.3 shall be reduced by multiplying such limitations by a fraction (a) the numerator of which is the number of years of participation (or part thereof) in the Plan and (b) the denominator of which is ten (10), provided, however, that said fraction shall in no event be less than 1/10th. The limitations of Sections 6.2(a)(2) and 6.4 shall be reduced in the same manner except the preceding sentence shall be applied with respect to years of service with the Employer rather than years of participation in the Plan.

18

Confidential

## ARTICLE VII
## PLAN AMENDMENT

**7.1   AMENDMENT**

(a)   The Employer shall have the right at any time to amend this Plan, subject to the limitations of this Section. However, any amendment which affects the rights, duties or responsibilities of the Trustee or Administrator may only be made with the Trustee's or Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution. The Trustee shall not be required to execute any such amendment unless the amendment affects the duties of the Trustee hereunder.

(b)   No amendment to the Plan shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants; or causes any reduction in the Accrued Benefit of any Participant (except to the extent permitted under Code Section 412(c)(8)); or causes or permits any portion of the Trust Fund to revert to or become property of the Employer.

(c)   Except as permitted by Regulations, no Plan amendment or transaction having the effect of a Plan amendment (such as a merger, plan transfer or similar transaction) shall be effective to the extent it eliminates or reduces any "Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" which results in a further restriction on such benefit unless such "Section 411(d)(6) protected benefits" are preserved with respect to benefits accrued as of the later of the adoption date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit.

## ARTICLE VIII
## PLAN TERMINATION

**8.1   TERMINATION**

(a)   The Employer shall have the right to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. Upon any termination (full or partial), all amounts shall be allocated in accordance with the provisions hereof and the Accrued Benefit, to the extent funded as of such date, of each affected Participant shall become fully Vested and shall not thereafter be subject to forfeiture. However, Participants who were not fully Vested at the time they received a complete distribution of their Vested benefits prior to the date of termination, shall not become entitled to any additional Vested benefits on account of Plan termination. The preceding sentence does not apply to Participants affected by a partial termination by operation of law. Upon full termination of the Plan, the Employer shall direct the distribution

19

of the assets in the Trust Fund to the Participants in a manner which is consistent with Section 5.6. In such case, the Trustee shall distribute the assets to the remaining Participants in the Plan and to retired Participants in cash or through the purchase of irrevocable deferred commitments from an insurer, subject to provision for expenses of administration or liquidation. Such distributions shall be allocated in the following order to the extent of the sufficiency of such assets, basing such allocation on the Accrued Benefit for each such Participant at the date of termination of the Plan:

(1)     to provide pensions to retired Participants who have retired under the Plan prior to its termination without reference to the order of retirement;

(2)     to provide Normal Retirement Benefits to Participants who have reached their Normal Retirement Dates but have not retired on the date of termination, without reference to the order in which they shall have reached their Normal Retirement Date;

## 8.2    LIMITATION OF BENEFITS ON PLAN TERMINATION

In the event of Plan termination, the benefit of any Highly Compensated Participant or any highly compensated former employee shall be limited to a benefit that is nondiscriminatory under Code Section 401(a)(4).

## ARTICLE IX
## MISCELLANEOUS

## 9.1    PARTICIPANT'S RIGHTS

This Plan shall not be deemed to constitute a contract between the Employer and any Participant or to be a consideration or an inducement for the employment of any Participant or Employee. Nothing contained in this Plan shall be deemed to give any Participant or Employee the right to be retained in the service of the Employer or to interfere with the right of the Employer to discharge any Participant or Employee at any time regardless of the effect which such discharge shall have upon the Employee as a Participant of this Plan.

## 9.2    ALIENATION

(a)     Subject to the exceptions provided below, no benefit which shall be payable out of the Trust Fund to any person (including a Participant) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

20

Confidential

(b)     Subsection (a) shall not apply to a "qualified domestic relations order" defined in Code Section 414(p), and those other domestic relations orders permitted to be so treated by the Administrator under the provisions of the Retirement Equity Act of 1984. The Administrator shall establish a written procedure to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders. Further, to the extent provided under a "qualified domestic relations order," a former spouse of a Participant shall be treated as the spouse or surviving spouse for all purposes under the Plan.

9.3     CONSTRUCTION OF PLAN

This Plan shall be construed and enforced according to the Code, the Act and the laws of the State of Vermont, other than its laws respecting choice of law, to the extent not pre-empted by the Act.

9.4     GENDER AND NUMBER

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

9.5     LEGAL ACTION

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable.

9.6     PROHIBITION AGAINST DIVERSION OF FUNDS

(a)     Except as provided below and otherwise specifically permitted by law, it shall be impossible by operation of the Plan or of the Trust, by termination of either, by power of revocation or amendment, by the happening of any contingency, by collateral arrangement or by any other means, for any part of the corpus or income of any Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Former Participants, or their Beneficiaries.

(b)     In the event the Employer shall make an excessive contribution under a mistake of fact pursuant to Act Section 403(c)(2)(A), the Employer may demand repayment of such excessive contribution at any time within one (1) year following the time of payment and the Trustees shall return such amount to the Employer within the one (1) year period. Earnings of the Plan attributable to the

21

Confidential

contributions may not be returned to the Employer but any losses attributable thereto must reduce the amount so returned.

9.7     EMPLOYER'S AND TRUSTEE'S PROTECTIVE CLAUSE

The Employer, Administrator and Trustee, and their successors, shall not be responsible for the validity of any Contract issued hereunder or for the failure on the part of the insurer to make payments provided by any such Contract, or for the action of any person which may delay payment or render a Contract null and void or unenforceable in whole or in part.

9.8     INSURER'S PROTECTIVE CLAUSE

Except as otherwise agreed upon in writing between the Employer and the insurer, an insurer which issues any Contracts hereunder shall not have any responsibility for the validity of this Plan or for the tax or legal aspects of this Plan. The insurer shall be protected and held harmless in acting in accordance with any written direction of the Trustee, and shall have no duty to see to the application of any funds paid to the Trustee, nor be required to question any actions directed by the Trustee. Regardless of any provision of this Plan, the insurer shall not be required to take or permit any action or allow any benefit or privilege contrary to the terms of any Contract which it issues hereunder, or the rules of the insurer.

9.9     RECEIPT AND RELEASE FOR PAYMENTS

Any payment to any Participant, the Participant's legal representative, or to any guardian or committee appointed for such Participant in accordance with the provisions of the Plan, shall, to the extent thereof, be in full satisfaction of all claims hereunder against the Trustee and the Employer, either of whom may require such Participant, legal representative, guardian or committee, as a condition precedent to such payment, to execute a receipt and release thereof in such form as shall be determined by the Trustee or Employer.

9.10    ACTION BY THE EMPLOYER

Whenever the Employer under the terms of the Plan is permitted or required to do or perform any act or matter or thing, it shall be done and performed by a person duly authorized by its legally constituted authority.

9.11    NAMED FIDUCIARIES AND ALLOCATION OF RESPONSIBILITY

The "named Fiduciaries" of this Plan are (1) the Employer, (2) the Administrator, (3) the Trustee, and (4) any Investment Manager appointed hereunder. The named Fiduciaries shall have only those specific powers, duties, responsibilities, and obligations as are specifically given them under the Plan, including, but not limited to, any agreement allocating or delegating their responsibilities, the terms of which are incorporated herein by reference. In general, the Employer shall have the sole responsibility for making the contributions provided for under Section 4.1; and shall have the authority to appoint and remove the Trustee and the Administrator; to formulate the Plan's "funding policy and method"; and to amend or terminate, in whole or in part, the Plan. The Administrator shall have the sole responsibility for the administration of the Plan, including, but not limited to, the items specified at Article II of the Plan, as the same may be allocated or delegated thereunder. The Trustee shall have the sole

22

responsibility of management of the assets held under the Trust, except to the extent directed pursuant to Article II or with respect to those assets, the management of which has been assigned to an Investment Manager, who shall be solely responsible for the management of the assets assigned to it, all as specifically provided in the Plan. Each named Fiduciary warrants that any directions given, information furnished, or action taken by it shall be in accordance with the provisions of the Plan, authorizing or providing for such direction, information or action. Furthermore, each named Fiduciary may rely upon any such direction, information or action of another named Fiduciary as being proper under the Plan, and is not required under the Plan to inquire into the propriety of any such direction, information or action. It is intended under the Plan that each named Fiduciary shall be responsible for the proper exercise of its own powers, duties, responsibilities and obligations under the Plan as specified or allocated herein. No named Fiduciary shall guarantee the Trust Fund in any manner against investment loss or depreciation in asset value. Any person or group may serve in more than one Fiduciary capacity.

9.12   HEADINGS

The headings and subheadings of this Plan have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

9.13   UNIFORMITY

All provisions of this Plan shall be interpreted and applied in a uniform, nondiscriminatory manner. In the event of any conflict between the terms of this Plan and any Contract purchased hereunder, the Plan provisions shall control.

23

Confidential

IN WITNESS WHEREOF, this Plan has been executed the day and year first above written.

The Roman Catholic Diocese of Burlington, Inc.

By _+ *Salvatore R. Matano*_

EMPLOYER

24

Confidential

DEB000044_0029

# PRIESTS' BENEFIT FUND RETIREMENT PLAN

## FUNDING POLICY AND METHOD

A pension benefit plan (as defined in the Employee Retirement Income Security Act of 1974) has been adopted by the company for the purpose of rewarding long and loyal service to the company by providing to employees additional financial security at retirement. Incidental benefits are provided in the case of disability, death or other termination of employment.

Since the principal purpose of the plan is to provide benefits at normal retirement age, the principal goal of the investment of the funds in the plan should be both security and long-term stability with moderate growth commensurate with the anticipated retirement dates of participants. Investments, other than "fixed dollar" investments, should be included among the plan's investments to prevent erosion by inflation. However, investments should be sufficiently liquid to enable the plan, on short notice, to make some distributions in the event of the death or disability of a participant.

Changes to documents:

Plan p. 9 (sec. 2.5) - the first two sentences.
Plan p. 12 (sec 5.1(a)) - benefit as of January 1, 2006.

Trust p. 1:  Introductory paragraph defining the Trustee has been replaced.
Trust signature page (p. 13) has been replaced (signature lines for all Trustees
have been added)

**EXHIBIT B**

# TABLE OF CONTENTS

## ARTICLE I
### TRUSTEES AND TRUST FUND

1.1 NAME OF TRUST ...........................................................................................1

## ARTICLE II
### PLAN

2.1 DELIVERY OF PLAN TO TRUSTEE.............................................................2

## ARTICLE III
### ADMINISTRATOR

3.1 NOTIFICATION OF NAME OF ADMINISTRATOR ....................................2

## ARTICLE IV
### CONTRIBUTIONS

4.1 RECEIPT OF CONTRIBUTION........................................................................3

## ARTICLE V
### TRUSTEE

5.1 BASIC RESPONSIBILITIES OF THE TRUSTEE...........................................3
5.2 INVESTMENT POWERS AND DUTIES OF THE TRUSTEE .......................4
5.3 OTHER POWERS OF THE TRUSTEE .............................................................4
5.4 DUTIES OF THE TRUSTEE REGARDING PAYMENTS .............................6
5.5 TRUSTEE'S COMPENSATION AND EXPENSES AND TAXES ..................6
5.6 ANNUAL REPORT OF THE TRUSTEE...........................................................7
5.7 AUDIT...................................................................................................................7
5.8 RESIGNATION, REMOVAL AND SUCCESSION OF TRUSTEE.................8
5.9 TRANSFER OF INTEREST...............................................................................9
5.10 TRUSTEE INDEMNIFICATION......................................................................9
5.11 DIRECT ROLLOVER .........................................................................................9

## ARTICLE VI
### AMENDMENT, TERMINATION AND MERGERS

6.1 AMENDMENT ...................................................................................................10
6.2 TERMINATION .................................................................................................11
6.3 MERGER, CONSOLIDATION OR TRANSFER OF ASSETS .....................11

## ARTICLE VII
### MISCELLANEOUS

7.1    QUALIFIED TRUST ............................................................................................11

7.2    CONSTRUCTION OF AGREEMENT........................................................................11

7.3    GENDER AND NUMBER ......................................................................................11

7.4    LEGAL ACTION ................................................................................................12

7.5    HEADINGS........................................................................................................12

7.6    IRREVOCABILITY OF TRUST ..............................................................................12

PRIESTS' BENEFIT FUND RETIREMENT PLAN

TRUST AGREEMENT

THIS AGREEMENT, hereby made and entered into this ___16ᵗʰ___ day of
___February, 2006___, by and between The Roman Catholic Diocese of
Burlington, Inc. (herein referred to as the "Employer") and the individuals holding the following
positions (which shall herein be collectively referred to as the "Trustee"):
Bishop of the Roman Catholic Diocese of Burlington, Inc.
Chancellor of the Roman Catholic Diocese of Burlington, Inc.
Finance Officer of the Roman Catholic Diocese of Burlington, Inc., and
the following members of the Priests' Benefit Fund Prudential Committee:
Chair, Secretary, and Treasurer of the Priests' Benefit Fund Board of Advisors.

WITNESSETH:

WHEREAS, the Employer has concurrently herewith adopted a Pension Plan
known as the Priests' Benefit Fund Retirement Plan (herein referred to as the Plan); and

WHEREAS, under the terms of the Plan, funds will from time to time be
contributed to the Trustees (herein referred to as the "Trustee"), which funds as and when
received by the Trustee, will constitute a trust fund to be held by said Trustee under the Plan for
the benefit of the Participants or their Beneficiaries; and

WHEREAS, the Employer desires the Trustee to hold and administer such funds
and the Trustee is willing to hold and administer such funds pursuant to the terms of this
Agreement;

NOW, THEREFORE, for and in consideration of the premises and of the mutual
covenants herein contained, the Employer and the Trustee do hereby covenant and agree as
follows:

ARTICLE I
TRUSTEES AND TRUST FUND

1.1   NAME OF TRUST

(a)      This Trust shall be entitled the "Priests' Benefit Fund Retirement
Plan Trust Agreement" (hereinafter referred to as the "Trust"), and shall carry into
effect the provisions of the Plan created concurrently herewith and forming a part
hereof. All of the definitions in such Plan are hereby incorporated herein by
reference. The Trustee hereby agrees to act as Trustee of the Trust, and to take,
hold, invest, administer and distribute in accordance with the following
provisions, any and all contributions and assets paid or delivered to the Trustee
pursuant to the Plan.

1

Confidential                    DEB000045_0003

(b)      All of the assets at any time held hereunder by the Trustee are hereinafter referred to collectively as the "Trust Fund." All right, title and interest in and to the assets of the Trust Fund shall be at all times, vested exclusively in the Trustee.

(c)      The Trustee shall receive, take and hold any contributions paid to the Trustee by the Employer in cash or in other property acceptable to the Trustee. All contributions so received together with the income therefrom and any other increment thereon shall be held managed and administered by the Trustee pursuant to the terms of this Agreement without distinction between principal and income and without liability for the payment of interest thereon. The Trustee shall not be responsible for the collection of any contributions to the Plan.

ARTICLE II
PLAN

## 2.1   DELIVERY OF PLAN TO TRUSTEE

The Employer shall deliver to the Trustee a copy of the Plan and of any amendment thereto for convenience of reference, but rights, powers, titles, duties, discretions and immunities of the Trustee shall be governed solely by this instrument without reference to the Plan.

ARTICLE III
ADMINISTRATOR

## 3.1   NOTIFICATION OF NAME OF ADMINISTRATOR

(a)      The Plan provides for the appointment of an Administrator or Administrators (herein referred to as the "Administrator"), to administer the Plan. The Employer shall notify the Trustee in writing of the name of the Administrator, and of any change in the identity of such Administrator. Until notified of the change, the Trustee shall be fully protected in acting upon the assumption that the identity of the Administrator has not been changed.

(b)      All directions by the Administrator to the Trustee shall be in writing signed by such Administrator.

(c)      The Employer shall furnish to the Trustee a specimen signature of the Administrator or Administrators at the time the Administrator or Administrators are appointed.

(d)      The Administrator shall have sole responsibility for determining the existence, non-existence, nature and amount of the rights and interests of all persons in the Trust Fund.

2

Confidential

### ARTICLE IV
### CONTRIBUTIONS

4.1     RECEIPT OF CONTRIBUTION

The Trustee shall receive all contributions paid in cash or other property acceptable to the Trustee, and all contributions so received together with the income therefrom and any increment thereon shall be held, managed and administered by the Trustee pursuant to this Agreement without distinction between principal and income. The Trustee shall have no duty to require any contributions to be made to the Trustee by the Employer or to determine that the amounts received comply with the Plan, or to determine that the Trust Fund is adequate to provide the benefits payable pursuant to the Plan.

### ARTICLE V
### TRUSTEE

5.1     BASIC RESPONSIBILITIES OF THE TRUSTEE

(a)     The Trustee shall have the following categories of responsibilities:

(1)     Consistent with the "funding policy and method" determined by the Employer, to invest, manage, and control the Plan assets subject, however, to the direction of the Employer or an Investment Manager if the Trustee should appoint such manager as to all or a portion of the assets of the Plan;

(2)     At the direction of the Administrator, to pay benefits required under the Plan to be paid to Participants, or, in the event of their death, to their Beneficiaries; and

(3)     To maintain records of receipts and disbursements and furnish to the Employer and/or Administrator for each Plan Year a written annual report pursuant to Section 5.6.

(b)     In the event that the Trustee shall be directed by the Employer, or an Investment Manager with respect to the investment of any or all Plan assets, the Trustee shall have no liability with respect to the investment of such assets, but shall be responsible only to execute such investment instructions as so directed.

(1)     The Trustee shall be entitled to rely fully on the written (or other form acceptable to the Administrator and the Trustee, including, but not limited to, voice recorded) instructions of the Employer, or any Fiduciary or nonfiduciary agent of the Employer, in the discharge of such duties, and shall not be liable for any loss or other liability, resulting from such direction (or lack of direction) of the investment of any part of the Plan assets.

3

Confidential                                     DEB000045_0005

(2)     The Trustee may delegate the duty of executing such instructions to any nonfiduciary agent, which may be an affiliate of the Trustee or any Plan representative.

(c)     If there shall be more than one Trustee, they shall act by a majority of their number, but may authorize one or more of them to sign papers on their behalf.

5.2     INVESTMENT POWERS AND DUTIES OF THE TRUSTEE

(a)     The Trustee shall invest and reinvest the Trust Fund to keep the Trust Fund invested without distinction between principal and income and in such securities or property, real or personal, wherever situated, as the Trustee shall deem advisable, including, but not limited to, stocks, common or preferred, open-end or closed-end mutual funds, bonds and other evidences of indebtedness or ownership, and real estate or any interest therein. The Trustee shall at all times in making investments of the Trust Fund consider, among other factors, the short and long-term financial needs of the Plan on the basis of information furnished by the Employer. In making such investments, the Trustee shall not be restricted to securities or other property of the character expressly authorized by the applicable law for trust investments; however, the Trustee shall give due regard to any limitations imposed by the Code or the Act so that at all times the Plan may qualify as a qualified Pension Plan and Trust.

(b)     The Trustee may employ a bank or trust company pursuant to the terms of its usual and customary bank agency agreement, under which the duties of such bank or trust company shall be of a custodial, clerical and record-keeping nature.

5.3     OTHER POWERS OF THE TRUSTEE

The Trustee, in addition to all powers and authorities under common law, statutory authority, including the Act, and other provisions of the Plan, shall have the following powers and authorities, to be exercised in the Trustee's sole discretion:

(a)     To purchase, or subscribe for, any securities or other property and to retain the same. In conjunction with the purchase of securities, margin accounts may be opened and maintained;

(b)     To sell, exchange, convey, transfer, grant options to purchase, or otherwise dispose of any securities or other property held by the Trustee, by private contract or at public auction. No person dealing with the Trustee shall be bound to see to the application of the purchase money or to inquire into the validity, expediency, or propriety of any such sale or other disposition, with or without advertisement;

(c)     To vote upon any stocks, bonds, or other securities; to give general or special proxies or powers of attorney with or without power of substitution; to

4

Confidential

exercise any conversion privileges, subscription rights or other options, and to make any payments incidental thereto; to oppose, or to consent to, or otherwise participate in, corporate reorganizations or other changes affecting corporate securities, and to delegate discretionary powers, and to pay any assessments or charges in connection therewith; and generally to exercise any of the powers of an owner with respect to stocks, bonds, securities, or other property. However, the Trustee shall not vote proxies relating to securities for which it has not been assigned full investment management responsibilities. In those cases where another party has such investment authority or discretion, the Trustee will deliver all proxies to said party who will then have full responsibility for voting those proxies;

(d)    To cause any securities or other property to be registered in the Trustee's own name, in the name of one or more of the Trustee's nominees, in a clearing corporation, in a depository, or in book entry form or in bearer form, but the books and records of the Trustee shall at all times show that all such investments are part of the Trust Fund;

(e)    To borrow or raise money for the purposes of the Plan in such amount, and upon such terms and conditions, as the Trustee shall deem advisable; and for any sum so borrowed, to issue a promissory note as Trustee, and to secure the repayment thereof by pledging all, or any part, of the Trust Fund; and no person lending money to the Trustee shall be bound to see to the application of the money lent or to inquire into the validity, expediency, or propriety of any borrowing;

(f)    To keep such portion of the Trust Fund in cash or cash balances as the Trustee may, from time to time, deem to be in the best interests of the Plan, without liability for interest thereon;

(g)    To accept and retain for such time as the Trustee may deem advisable any securities or other property received or acquired as Trustee hereunder, whether or not such securities or other property would normally be purchased as investments hereunder;

(h)    To make, execute, acknowledge, and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted;

(i)    To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan, to commence or defend suits or legal or administrative proceedings, and to represent the Plan in all suits and legal and administrative proceedings;

(j)    To employ suitable agents and counsel and to pay their reasonable expenses and compensation, and such agent or counsel may or may not be agent or counsel for the Employer;

5

Confidential

(k)      To apply for and procure from responsible insurance companies, to be selected by the Administrator, as an investment of the Trust Fund such annuity, or other Contracts (on the life of any Participant) as the Administrator shall deem proper; to exercise, at any time or from time to time, whatever rights and privileges may be granted under such annuity, or other Contracts; to collect, receive, and settle for the proceeds of all such annuity or other Contracts as and when entitled to do so under the provisions thereof;

(l)      To invest funds of the Trust in time deposits or savings accounts bearing a reasonable rate of interest or in cash or cash balances without liability for interest thereon;

(m)      To invest in Treasury Bills and other forms of United States government obligations;

(n)      To invest in shares of investment companies registered under the Investment Company Act of 1940;

(o)      To sell, purchase and acquire put or call options if the options are traded on and purchased through a national securities exchange registered under the Securities Exchange Act of 1934, as amended, or, if the options are not traded on a national securities exchange, are guaranteed by a member firm of the New York Stock Exchange regardless of whether such options are covered;

(p)      To deposit monies in federally insured savings accounts or certificates of deposit in banks or savings and loan associations;

(q)      To pool all or any of the Trust Fund, from time to time, with assets belonging to any other qualified employee pension benefit trust created by the Employer or any Affiliated Employer, and to commingle such assets and make joint or common investments and carry joint accounts on behalf of this Plan and Trust and such other trust or trusts, allocating undivided shares or interests in such investments or accounts or any pooled assets of the two or more trusts in accordance with their respective interests;

(r)      To do all such acts and exercise all such rights and privileges, although not specifically mentioned herein, as the Trustee may deem necessary to carry out the purposes of the Plan.

## 5.4      DUTIES OF THE TRUSTEE REGARDING PAYMENTS

At the direction of the Administrator, the Trustee shall, from time to time, in accordance with the terms of the Plan, make payments out of the Trust Fund. The Trustee shall not be responsible in any way for the application of such payments.

## 5.5      TRUSTEE'S COMPENSATION AND EXPENSES AND TAXES

The Trustee shall be paid such reasonable compensation as set forth in the Trustee's fee schedule (if the Trustee has such a schedule) or as agreed upon in writing by the

6

Confidential

Employer and the Trustee. However, an individual serving as Trustee who already receives full-time pay from the Employer shall not receive compensation from the Plan. In addition, the Trustee shall be reimbursed for any reasonable expenses, including reasonable counsel fees incurred by it as Trustee. Such compensation and expenses shall be paid from the Trust Fund unless paid or advanced by the Employer. All taxes of any kind whatsoever that may be levied or assessed under existing or future laws upon, or in respect of, the Trust Fund or the income thereof, shall be paid from the Trust Fund.

## 5.6    ANNUAL REPORT OF THE TRUSTEE

(a)    Within a reasonable period of time after the later of the Anniversary Date or receipt of the Employer contribution for each Plan Year, the Trustee, or its agent, shall furnish to the Employer and Administrator a written statement of account with respect to the Plan Year for which such contribution was made setting forth:

(1)    the net income, or loss, of the Trust Fund;

(2)    the gains, or losses, realized by the Trust Fund upon sales or other disposition of the assets;

(3)    the increase, or decrease, in the value of the Trust Fund;

(4)    all payments and distributions made from the Trust Fund; and

(5)    such further information as the Trustee and/or Administrator deems appropriate.

(b)    The Employer, promptly upon its receipt of each such statement of account, shall acknowledge receipt thereof in writing and advise the Trustee and/or Administrator of its approval or disapproval thereof. Failure by the Employer to disapprove any such statement of account within thirty (30) days after its receipt thereof shall be deemed an approval thereof. The approval by the Employer of any statement of account shall be binding on the Employer and the Trustee as to all matters contained in the statement to the same extent as if the account of the Trustee had been settled by judgment or decree in an action for a judicial settlement of its account in a court of competent jurisdiction in which the Trustee, the Employer and all persons having or claiming an interest in the Plan were parties. However, nothing contained in this Section shall deprive the Trustee of its right to have its accounts judicially settled if the Trustee so desires.

## 5.7    AUDIT

(a)    If an audit of the Plan's records shall be required by the Act and the regulations thereunder for any Plan Year, the Administrator shall direct the Trustee to engage on behalf of all Participants an independent qualified public accountant for that purpose. Such accountant shall, after an audit of the books and records of the Plan in accordance with generally accepted auditing standards, within a reasonable period after the close of the Plan Year, furnish to the

7

Confidential

Administrator and the Trustee a report of the audit setting forth the accountant's opinion as to whether any statements, schedules or lists that are required by Act Section 103 or the Secretary of Labor to be filed with the Plan's annual report, are presented fairly in conformity with generally accepted accounting principles applied consistently.

(b)      All auditing and accounting fees shall be an expense of and may, at the election of the Employer, be paid from the Trust Fund.

(c)      If some or all of the information necessary to enable the Administrator to comply with Act Section 103 is maintained by a bank, insurance company, or similar institution, regulated, supervised, and subject to periodic examination by a state or federal agency, then it shall transmit and certify the accuracy of that information to the Administrator as provided in Act Section 103(b) within one hundred twenty (120) days after the end of the Plan Year or such other date as may be prescribed under regulations of the Secretary of Labor.

5.8      RESIGNATION, REMOVAL AND SUCCESSION OF TRUSTEE

(a)      Unless otherwise agreed to by both the Trustee and the Employer, a Trustee may resign at any time by delivering to the Employer, at least thirty (30) days before its effective date, a written notice of resignation.

(b)      Unless otherwise agreed to by both the Trustee and the Employer, the Employer may remove a Trustee at any time by delivering to the Trustee, at least thirty (30) days before its effective date, a written notice of such Trustee's removal.

(c)      Upon the death, resignation, incapacity, or removal of any Trustee, a successor may be appointed by the Employer; and such successor, upon accepting such appointment in writing and delivering same to the Employer, shall, without further act, become vested with all the powers and responsibilities of the predecessor as if such successor had been originally named as a Trustee herein. Until such a successor is appointed, the remaining Trustee or Trustees shall have full authority to act under the terms of the Plan.

(d)      The Employer may designate one or more successors prior to the death, resignation, incapacity, or removal of a Trustee. In the event a successor is so designated by the Employer and accepts such designation, the successor shall, without further act, become vested with all the powers and responsibilities of the predecessor as if such successor had been originally named as Trustee herein immediately upon the death, resignation, incapacity, or removal of the predecessor.

(e)      Whenever any Trustee hereunder ceases to serve as such, the Trustee shall furnish to the Employer and Administrator a written statement of account with respect to the portion of the Plan Year during which the individual or entity served as Trustee. This statement shall be either (i) included as part of

8

Confidential

the annual statement of account for the Plan Year required under Section 5.6 or (ii) set forth in a special statement. Any such special statement of account should be rendered to the Employer no later than the due date of the annual statement of account for the Plan Year. The procedures set forth in Section 5.6 for the approval by the Employer of annual statements of account shall apply to any special statement of account rendered hereunder and approval by the Employer of any such special statement in the manner provided in Section 5.6 shall have the same effect upon the statement as the Employer's approval of an annual statement of account. No successor to the Trustee shall have any duty or responsibility to investigate the acts or transactions of any predecessor who has rendered all statements of account required by Section 5.6 and this subparagraph.

5.9     TRANSFER OF INTEREST

Notwithstanding any other provision contained in this Plan, the Trustee at the direction of the Administrator shall transfer the Vested interest, if any, of a Participant to another trust forming part of a pension, profit sharing or stock bonus plan maintained by such Participant's new employer and represented by said employer in writing as meeting the requirements of Code Section 401(a), provided that the trust to which such transfers are made permits the transfer to be made.

5.10    TRUSTEE INDEMNIFICATION

The Employer agrees to indemnify and hold harmless the Trustee against any and all claims, losses, damages, expenses and liabilities the Trustee may incur in the exercise and performance of the Trustee's power and duties hereunder, unless the same are determined to be due to gross negligence or willful misconduct.

5.11    DIRECT ROLLOVER

(a)     Notwithstanding any provision of the Plan to the contrary that would otherwise limit a "distributee's" election under this Section, a "distributee" may elect, at the time and in the manner prescribed by the Administrator, to have any portion of an "eligible rollover distribution" that is equal to at least $500 paid directly to an "eligible retirement plan" specified by the "distributee" in a "direct rollover."

(b)     For purposes of this Section the following definitions shall apply:

(1)     An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the "distributee," except that an "eligible rollover distribution" does not include: any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made for the life (or life expectancy) of the "distributee" or the joint lives (or joint life expectancies) of the "distributee" and the "distributee's" designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); the portion of any other distribution that is not includible in gross income (determined

9

without regard to the exclusion for net unrealized appreciation with respect to employer securities); any hardship distribution described in Code Section 401(k)(2)(B)(i)(IV); and any other distribution that is reasonably expected to total less than $200 during a year.

(2)     An "eligible retirement plan" is an individual retirement account described in Code Section 408(a), an individual retirement annuity described in Code Section 408(b), an annuity plan described in Code Section 403(a), or a qualified trust described in Code Section 401(a), that accepts the "distributee's" "eligible rollover distribution." However, in the case of an "eligible rollover distribution" to the surviving spouse, an "eligible retirement plan" is an individual retirement account or individual retirement annuity.

(3)     A "distributee" includes an Employee or former Employee. In addition, the Employee's or former Employee's surviving spouse and the Employee's or former Employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are "distributees" with regard to the interest of the spouse or former spouse.

(4)     A "direct rollover" is a payment by the Plan to the "eligible retirement plan" specified by the "distributee."

ARTICLE VI
AMENDMENT, TERMINATION AND MERGERS

6.1     AMENDMENT

(a)     The Employer shall have the right at any time to amend this Agreement. However, any amendment which affects the rights, duties or responsibilities of the Trustee or Administrator may only be made with the Trustee's or Administrator's written consent. Any such amendment shall become effective as provided therein upon its execution. The Trustee shall not be required to execute any such amendment unless the amendment affects the duties of the Trustee hereunder.

(b)     No amendment to this Agreement shall be effective if it authorizes or permits any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to any purpose other than for the exclusive benefit of the Participants or their Beneficiaries or estates; or cause any reduction in the Accrued Benefit of any Participant (except to the extent permitted under Code Section 412(c)(8)); or cause or permit any portion of the Trust Fund to revert to or become property of the Employer.

(c)     Except as permitted by Regulations (including Regulation 1.411(d)-4), no amendment to this Agreement (such as a merger, plan transfer or similar transaction) shall be effective if it eliminates or reduces any

10

Confidential

"Section 411(d)(6) protected benefit" or adds or modifies conditions relating to "Section 411(d)(6) protected benefits" which results in a further restriction on such benefit unless such "Section 411(d)(6) protected benefits" are preserved with respect to benefits accrued as of the later of the execution date or effective date of the amendment. "Section 411(d)(6) protected benefits" are benefits described in Code Section 411(d)(6)(A), early retirement benefits and retirement-type subsidies, and optional forms of benefit.

## 6.2   TERMINATION

This Agreement and the Trust created hereby will terminate as to the Employer in the case of complete distribution of the Trust Fund held for the benefit of the Participants pursuant to the Plan. Such distribution will be at the time and manner determined by the Administrator pursuant to the requirements of the Plan with written instructions to the Trustee. Except as permitted by Regulations, the termination of the Plan shall not result in the reduction of "Section 411(d)(6) protected benefits" in accordance with Section 6.1(c).

## 6.3   MERGER, CONSOLIDATION OR TRANSFER OF ASSETS

This Trust may be merged or consolidated with, or its assets and/or liabilities may be transferred to any other trust only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the Plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation, and such transfer, merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" in accordance with Section 6.1(c).

### ARTICLE VII
### MISCELLANEOUS

## 7.1   QUALIFIED TRUST

The Trust is hereby designated as constituting a part of the Plan which is intended to continue to qualify and to be tax exempt under Section 401(a) and Section 501(a), respectively, of the Code, and of the Act, as amended from time to time. Until advised otherwise, the Trustee may conclusively presume that this Trust is qualified under Section 501(a) of the Code as amended from time to time, and that this Trust is exempt from federal income taxes.

## 7.2   CONSTRUCTION OF AGREEMENT

This Trust shall be construed and enforced according to the Code, the Act and the laws of the State of Vermont, other than its laws respecting choice of law, to the extent not pre-empted by the Act.

## 7.3   GENDER AND NUMBER

Wherever any words are used herein in the masculine, feminine or neuter gender, they shall be construed as though they were also used in another gender in all cases where they

11

would so apply, and whenever any words are used herein in the singular or plural form, they shall be construed as though they were also used in the other form in all cases where they would so apply.

## 7.4   LEGAL ACTION

In the event any claim, suit, or proceeding is brought regarding the Trust and/or Plan established hereunder to which the Trustee, the Employer or the Administrator may be a party, and such claim, suit, or proceeding is resolved in favor of the Trustee, the Employer or the Administrator, they shall be entitled to be reimbursed from the Trust Fund for any and all costs, attorney's fees, and other expenses pertaining thereto incurred by them for which they shall have become liable.

## 7.5   HEADINGS

The headings and subheadings of this Agreement have been inserted for convenience of reference and are to be ignored in any construction of the provisions hereof.

## 7.6   IRREVOCABILITY OF TRUST

All contributions made by the Employer shall be irrevocable, and no part of the corpus of the Trust Fund or any income therefrom shall revert to the Employer or be used for or diverted to purposes other than for the exclusive benefit of the Participants and their Beneficiaries, except as provided by law, as provided in the Plan.

12

Confidential

IN WITNESS WHEREOF, this Trust has been executed the day and year first above written.

The Roman Catholic Diocese of Burlington, Inc.

By: _____
         EMPLOYER

By: _____
      TRUSTEE - Bishop

By: _____
      TRUSTEE - Chancellor

By: _____
      TRUSTEE - Finance Officer

By: _____
      TRUSTEE - Chair PBF Board of Advisors

By: _____
      TRUSTEE - Secretary PBF Board of Advisors

By: _____
      TRUSTEE - Treasurer PBF Board of Advisors

13

**The Roman Catholic Diocese of Burlington, Inc.**
**Certificate for Administrative Board's Resolution to**
**Adopt Restated Plan Document for the**
**Priests' Benefit Fund Retirement Plan**

WHEREAS, The Roman Catholic Diocese of Burlington, Inc. (the "Diocese") heretofore established the Priests' Benefit Fund Retirement Plan (the "Plan") in the form of a defined benefit pension plan effective July 1, 1972;

WHEREAS, the plan documents for the Plan have enabled the Diocese to amend the Plan, provided the Trustee joins in such amendment if the provisions of the Plan affecting the Trustee are amended;

WHEREAS, the Diocese has adopted several interim amendments for the Plan since the Diocese adopted a restated plan document on February 16, 2006, effective July 1, 2005;

WHEREAS, the Employer wishes to incorporate these interim amendments and others changes into a more current restated plan document;

WHEREAS, the other changes include new provisions relating to an account established and maintained pursuant to Internal Revenue Code Section 401(h) for funding retiree health benefits; and

NOW; THEREFORE, BE IT RESOLVED THAT:

1. Effective July 1, 2015, the Diocese hereby amends and restates the plan document for the Plan in its entirety, substantially in the form attached hereto;

2. Bishop Christopher J. Coyne be, and hereby is, authorized and directed to execute the aforementioned restated plan document for the Plan on behalf of the Diocese, and to take such further actions as Bishop Coyne, in his sole discretion, deems necessary, appropriate or desirable to carry out the intent of this and the foregoing resolution, including, without limitation, adopting revised restated plan documents for the Plan not inconsistent with the general tenor of the substantive provisions of the attached restated plan document.

The undersigned Secretary of the Administrative Board for the Diocese hereby certifies that the foregoing resolutions were duly adopted by the Administrative Board on the 11th day of June, 2016.

_____
Msgr. John J. McDermott, Secretary of the Administrative Board

6·27·16
_____
Date

S:\VT Diocese\Restated plan document\04 Board Resolution Certificate 6-6-2016  Restated plan document.doc

**Trust Agreement for the
Priests' Benefit Fund Retirement Plan**

---

**First Amendment**

---

The Roman Catholic Diocese of Burlington, Inc. (the "Diocese") having adopted the Trust Agreement for the Priests' Benefit Fund Retirement Plan on February 16, 2006, effective July 1, 2005, and having reserved to itself in Section 6.1 of the Trust Agreement the right to amend the Plan at any time hereby amends the Trust Agreement, effective July 1, 2015, as follows:

1.  Section 5.8, which provides for the resignation, removal, and succession of Trustees, is first amended by renumbering Paragraphs (a) through (e) as Paragraphs (b) through (f), respectively.

2.  Section 5.8 is then amended by adding new paragraph (a) that reads as follows:

    (a)    The Trust shall have six Trustees. Each Trustee is appointed by virtue of holding one of the following three offices with the Diocese or one of the following three offices with the Priests' Benefit Fund:

    | Diocese | Priests' Benefit Fund |
    |---|---|
    | 1.  Bishop | 1.  Chair |
    | 2.  Vicar General | 2.  Secretary |
    | 3.  Finance Officer | 3.  Treasurer |

    A Trustee holding one of the above-listed offices shall be removed as Trustee by virtue of ceasing to hold the office, unless the Trustee resigns or is removed earlier as elsewhere provided in this Section 5.8.

                    *      *      *      *      *

    IN WITNESS WHEREOF, the Diocese has caused this amendment to be duly executed in its name and on its behalf on the date shown below.

                            The Roman Catholic Diocese of Burlington, Inc.

_____          By:    _____
Date    June 23, 2016                   Bishop Christopher J. Coyne

S:\VT Diocese\Restated plan document\07 Trust Agreement 6-23-2016 First Amendment.doc