**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| IN RE: ) | |
| ) | |
| ROMAN CATHOLIC DIOCESE OF BURLINGTON, ) | Case No. 24-10205-HZC |
| VERMONT,[1] ) | Chapter 11 |
| ) | |
| Debtor. ) | |
| ) | |

**RESPONSE AND OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTOR'S MOTION FOR AN ORDER AUTHORIZING THE PAYMENT OF PENSION BENEFITS TO CREDIBLY ACCUSED PRIESTS**

The Official Committee of Unsecured Creditors (the "Committee") appointed in the above-captioned chapter 11 bankruptcy case of The Roman Catholic Diocese of Burlington, Vermont (the "Diocese") represents general unsecured creditors who are survivors ("Survivors") of tragic childhood sexual abuse at the hands of priests and others who were under the supervision of the Diocese. The Committee submits the following response pursuant to the Court's order and briefing schedule entered on January 29, 2025 at Docket No. 181.

**I. PRELIMINARY STATEMENT**

1. The Diocese should not continue paying lifetime retirement benefits to two priests who *it* investigated in response to claims of childhood sexual abuse and who *the Diocese* concluded were credibly accused of abusing children (the "Credibly Accused Priests"). The Diocese is paying the Credibly Accused Priests on the grounds that they have "vested" retirement benefits and the Holy See elected not to laicize them. In fact, the Benefit Plan gives broad discretion to the Diocese to determine who is eligible and it should exercise that discretion to exclude the Credibly Accused Priests. The Court should not accept ambiguous hearsay

---

[1] The Diocese's address is 55 Joy Drive, South Burlington, VT 05403, and its EIN Number is 03-0180730.

{LG 00839813.1 }4906-1092-3558.2 18506.00002

statements regarding how the Holy See seeks to "treat" the Credibly Accused Priests under Canon Law by continuing benefits, nor should the Court allow the Diocese to support abusive clergy at the expense of the estate and to the detriment of Survivors.

2.  The Committee opposes payment of pension benefits to the Credibly Accused Priests on the grounds that (1) the Priests' Benefit Fund Retirement Plan ("Benefit Plan") does not require such payment, and (2) the Diocese has wholly failed to meet its burden of demonstrating the necessity of payment, including failing to prove that pension payments to the Credibly Accused Priests are in the ordinary course of business or supported by sound business judgment. Payment of pension benefits to the Credibly Accused Priests openly aggravates the trauma suffered by Survivors. Moreover, the Diocese's payment of pension benefits to the Credibly Accused Priests does not benefit the estate and there is no evidence that termination of the pension benefits would result in civil liability.

## II. PROCEDURAL BACKGROUND

3.  On September 30, 2024 (the "Petition Date"), the Diocese commenced a voluntary case under chapter 11 of the Bankruptcy Code. Bishop McDermott declared in his first day affidavit that sexual abuse is contrary to the teachings and traditions of the Catholic Church and no priest who is found to have sexually abused a minor can ever return to public ministry. *See* Docket No. 13, ¶¶ 30, 42-44.

4.  On the Petition Date, the Diocese brought an *Emergency Motion and Memorandum for an Order (I) Authorizing the Debtor to Pay Accrued and Outstanding Prepetition Employee Compensation, Benefits, and Related Amounts and (II) Authorizing the Debtor to Maintain Existing Payroll Service* ("Wage Motion") [Docket No. 8]. The Wage Motion described the "Priests' Benefit Fund" but made no mention of the Credibly Accused Priests.

5. On October 22, 2024, the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code. The Committee consists of five individuals who were sexually abused as minors by perpetrators for whom the Debtor was responsible. *See Appointment of Official Committee of Unsecured Creditors* [Docket No. 52].

6. On December 17, 2024, the Court entered an interim order on the Wage Motion, bifurcating the matter of retired priest benefits and otherwise authorizing the Diocese to continue administering the Benefit Plans. [Docket No. 126].

7. On January 29, 2025, the Court extended its interim order and issued a briefing schedule for a final determination of pension, benefits and related amounts payable to retired priests. A final hearing is scheduled on March 25, 2025 at 11:00 a.m. [Docket No. 181].

8. On February 18, 2025, the Diocese filed its *Debtor's Memorandum in Support of Ordinary Course Payments of Vested Retirement Benefits* ("Debtor's Memorandum") and supporting affidavit of Bishop John J. McDermott. [Docket Nos. 215, 216]. The Committee opposes the relief for reasons set forth below.

### III.  LEGAL ARGUMENT

**A.     The Benefit Plan Does Not Require Payment of the Credibly Accused Priests.**

9. The Diocese argues that the Credibly Accused Priests have vested pension benefits and the terms of the Benefit Plan do not give the Diocese discretion to terminate payments without potentially incurring a liability. Debtor's Memorandum, ¶25. The Benefit Plan (Exhibit A to McDermott Aff.) states otherwise. Furthermore, no provision of the

Bankruptcy Code requires that the Diocese pay pension benefits to the Credibly Accused Priests or others.[2]

10. The Diocese is the Administrator of the Benefit Plan for the exclusive benefit of the Participants and their Beneficiaries. Benefit Plan, §2.3; McDermott Aff., ¶11.

11. The Diocese acknowledges that accusations against the Credibly Accused Priests are credible. McDermott Aff., ¶16.

12. Section 2.3 of the Benefit Plan, entitled Powers and Duties of the Administrator, states that the Administrator is charged with "the discretion to determine all questions relating to the eligibility of Employees to participate or remain a Participant hereunder and to receive benefits under the Plan." Benefit Plan, ¶2.3(a). There are no limitations on the Diocese's discretion to determine eligibility. The definition of "Eligible Employee" excludes "disassociated" priests and does not limit the Administrator's discretion to determine eligibility only as it relates to "disassociated" priests. At most, it establishes only one criterion for determining ineligibility.

13. Further, section 3.3 of the Benefit Plan, entitled Determination of Eligibility, states: "The Administrator shall determine the eligibility of each Employee for participation in the Plan based upon information furnished by the Employer [the Diocese]. Such determination shall be conclusive and binding upon all persons, as long as the same is made pursuant to the Plan."[3] Benefit Plan, §3.3. Again, there are no limitations or criteria specifying what can or cannot be considered by the Diocese for purposes of determining an employee's eligibility.

---

[2] Bankruptcy Code section 1114, entitled Payment of insurance benefits to retired employees, does not cover pension benefits. Bankr. Code §1114(a) (definition of retiree benefits). *See In re Avaya Inc.,* 573 B.R. 93, 99 (Bankr. S.D.N.Y. 2017) (citing cases).
[3] According to the Diocese, the Benefit Plan is not governed by ERISA. *See* Debtor's Memorandum at 10 fn.4.

14. Finally, section 3.4 of the Benefit Plan, entitled Termination of Eligibility, states: "In the event a Participant shall go from a classification of an Eligible Employee to an ineligible Employee, such Former Participant shall not be eligible for benefits under this Plan unless such Former Participant again meets the requirements to be an Eligible Employee." Benefit Plan, §3.4. Termination of eligibility can occur at any time and is not described in terms of whether the Participant is Vested, as defined under the plan. This section does not limit the ineligibility of the Participant to "disassociated" priest.

15. The foregoing sections confirm the Diocese's discretion to determine who is eligible to receive priest pension benefits. Nevertheless, the Diocese argues that the plan only confers discretion regarding Employees and Participants, and is "silent as to whether the Diocese can exercise discretion as to 'Retired Participants'" (Debtor's Memorandum, ¶27) such that the Diocese allegedly lacks clear authority to terminate payments to the "Retired Participants" who are Credibly Accused Priests. This argument ignores the fact that the term Retired Participant, Former Participant, and Terminated Participant are merely defined subsets of the broader term Participant. *See* Benefit Plan, §§ 1.18, 1.32, and 1.35 (each describing a person who has been a Participant). The Diocese retains discretion over the eligibility of the broader group of Participants. Even the definition of Participant is limited by the phrase "and has not for *any reason* become ineligible to participate further in the Plan." *Id.,* §1.28 (emphasis added). In fact, the Diocese retains discretion to determine eligibility of employees to "*remain a Participant* hereunder and to receive benefits under the Plan." *Id.*, §2.3(a) (emphasis added).

16. The Diocese is not under any contractual or statutory obligation to extend benefits to the Credibly Accused Priests. Presumably, a finding of credible sexual abuse by the Diocese's own investigatory panel and the concurring conclusion of the Bishop is enough to warrant a

discretionary determination that the Credibly Accused Priests are ineligible to participate in a pension. Certainly, payments to the Credibly Accused Priests are not essential to the Diocese's continued operations or to the morale of its current employees. *See* Wage Motion, ¶52. The Diocese's rationale that such pension payments are necessary in the ordinary course and supported by business judgment ring hollow in a bankruptcy precipitated by abusive clergy in which Survivors have waited years for redress and compensation.

    **B.    Payment of Pension Benefits to the Credibly Accused Priests Fails to Satisfy Heightened Scrutiny or the Ordinary Course of Business Tests Under Bankruptcy Code Section 363(c)(1).**

    17.    The Diocese argues that pension payments to the Credibly Accused Priests are part of the ordinary course of the Diocese's business under Bankruptcy Code section 363(c)(1), and therefore do not require notice and a hearing. Transactions by a debtor outside of the ordinary course of business, and made without notice and a hearing, are presumptively void and unenforceable. *Medical Malpractice Ins. Ass'n v. Hirsch (In re Lavigne),* 114 F.3d 379, 384 (2d Cir. 1997); *In re Leslie Fay Cos.,* 168 B.R. 294, 304 (Bankr. S.D.N.Y. 1994).

    18.    This Court should not look to the Diocese's ordinary course of business with respect to pension payments by the Diocese to its priests. Courts apply heightened scrutiny to transactions with insiders in lieu of deferring to the ordinary course and the debtor's business judgment. *In re Flour City Bagels, LLC,* 557 B.R. 53, 78 (Bankr. W.D.N.Y. 2016). Insiders encompass more than the categories enumerated under Bankruptcy Code section 101(31) and may be determined on a case-by-case basis. *See e.g., In re Borders Grp., Inc.,* 453 B.R. 459, 469 (Bankr. S.D.N.Y. 2011) (director level/insider executives tend to be senior management). The Diocese's priests, including the Credibly Accused Priests, are sufficiently senior in the diocesan hierarchy to warrant heightened scrutiny to receive ongoing cash payments. Irrespective of how

the Diocese conducted its business in the past, it should not be allowed to continue payments to abusive priests that are the genesis of its bankruptcy.

19. Even if the Court applies a less stringent ordinary course of business standard, the Diocese's pension payments to the Credibly Accused Priests should be denied under Bankruptcy Code section 363(c)(1). The Diocese's contention that the pension payments at issue are ordinary course is belied by the Bishop's testimony that the Diocese sought guidance from the Holy See in 2004 regarding "how to proceed as to treatment" of the Credibly Accused Priests. McDermott Aff., ¶14.

20. The Second Circuit employs a two-part analysis to determine whether a transaction is part of the ordinary course of business: (1) under the "vertical test," the court takes the creditor's perspective to determine whether the transaction subjects the creditor to economic risks of a different nature from those he accepted; and (2) under the "horizontal test," the court takes an industry-wide perspective to compare "whether the post-petition transaction is of a type that other similar businesses would engage in as ordinary business." *In re Lavigne,* 114 F.3d at 384-85; *accord* Debtor's Memorandum, ¶20.

21. Payment of pension benefits to the Credibly Accused Priests fails both the vertical and horizontal tests of *Lavigne*.

    a. First, the Committee objects to pension payments to the Credibly Accused Priests, not all priests. The Committee disputes that payment of funds to "eligible priests" from 1952 through present (Debtor's Memorandum, ¶21) has any relevance to a hypothetical creditor's expectation of benefits extended to the Credibly Accused Priests who have each been accused of morally, spiritually, and legally repugnant acts of sexual abuse. A hypothetical creditor would reasonably expect that abusive priests, responsible for untold damages to

Survivors and the very liability that led to this bankruptcy, be deemed ineligible to collect pension benefits. This is particularly true given the language of the Benefit Plan that confers broad discretion to the Diocese to determine eligibility without reference to time or years of service. Furthermore, there is no reason to believe that a hypothetical creditor would expect continued payments to the Credibly Accused Priests to avoid potential litigation expense and the purported likelihood of a reduced payout from the bankruptcy (*id.*). There is simply no evidence of a litigation risk and the Committee objects to payments that reduce the Diocese's estate. *See, e.g., In re Enron Corp,..,* 2003 Bankr. LEXIS 2111 at *63-66 (Bankr. S.D.N.Y. Mar. 21, 2003) (proposed payment of fiduciary expenses failed vertical and horizontal tests).

        b.      Second, pension payments to the Credibly Accused Priests cannot satisfy the horizontal test for an ordinary course transaction. While other debtors in diocesan bankruptcies may pay ongoing post-petition pension benefits, those debtors are not paying priests who have been investigated and acknowledged to be credibly accused abusers.[4] The very fact that the Diocese sought guidance from the Holy See regarding how it should treat five accused priests demonstrates that the Diocese's actions with respect to two of those priests – the Credibly Accused Priests – are not ordinary course transactions within the region or the church industry. *See* McDermott Aff., ¶14.

---

[4] *See* Debtor's Memorandum, ¶22 citing *In re Diocese of Rochester,* Case No. 19-20905 (PRW), ECF No. 269 (Bankr. W.D.N.Y. Nov. 22, 2019) ("Nothing contained herein shall authorize the Debtor to pay Unpaid Compensation to any Employee (including a clergy member) who has been accused of engaging in conduct that would constitute a sexual offense as defined in Article 130 of the New York Penal Law against a person who is less than 18 years of age…"); *In re The Diocese of Buffalo, N.Y.*, Case No 20-10322 (CLB), ECF No. 250 (Bankr. W.D.N.Y. April 21, 2020) ("Notwithstanding anything to the contrary set forth herein, nothing in this Order shall authorize payment to any person against whom there have been substantiated allegations of sexual abuse of a minor or vulnerable adult (as identified on the Diocesan website). Further, as of and including May 1, 2020, the Diocese shall not make any payments to, or for the benefit of (i) any person identified on the list of Diocesan Priests with Substantiated Allegations of Abuse of a Minor. . . posted on the Diocese's website, or (ii) any other person against whom allegations of sexual abuse of a minor or vulnerable adult have been made and which allegations the Diocese has determined to be substantiated…").

22. The Diocese's payments to the Credibly Accused Priests do not withstand heightened scrutiny, nor do they fall within the ordinary course of business under Bankruptcy Code section 363(c)(1). Accordingly, they require notice and a hearing, and articulation of more than just sound business judgment discussed below.

      **C.    The Diocese Fails to Demonstrate a Sound Business Reason for Payments to the Credibly Accused Priests Under Bankruptcy Code Section 363(b)(1).**

23. The Diocese recognizes, as it must, that if pension payments to the Credibly Accused Priests fall outside of the ordinary course of business, the Diocese cannot continue such payments without notice and a hearing to affirmatively demonstrate a sound business reason for the payments under Bankruptcy Code section 363(b)(1). Debtor's Memorandum, ¶24. The Diocese falls short of its burden of demonstrating sound business judgment, much less a sufficient reason to continue paying the Credibly Accused Priests if the Court applies heightened scrutiny.

24. The Second Circuit authorizes the use of estate property under section 363(b)(1) of the Bankruptcy Code if there is a sound business reason. *In re Lionel Corp.,* 722 F.2d 1063, 1069 (2d Cir. 1983); *In re Ionosphere Clubs, Inc.,* 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). In *In re Lionel Corp.,* the bankruptcy court authorized the debtor's sale of stock based on the committee's support of the motion and the judge's own experience and opinion that failure to confirm the sale would hurt the chance of reorganization, but without any findings of fact. *Id.* at 1065-66. On appeal, the sale was reversed and remanded, stating: "The rule we adopt requires that a judge determining a section 363(b) application ***expressly find from the evidence presented before him at the hearing a good business reason to grant such an application***." *Id.* at 1071 (emphasis added). The debtor carries the burden of demonstrating by a preponderance of the evidence that use of estate property outside of the ordinary course will aid the debtor's

reorganization, and an objecting party is required to produce some evidence for its objection. *Id.; see also In re Flour City Bagels, LLC,* 557 B.R. at 77. Where the proposed transaction involves an insider, the absence of bad faith is not enough to justify the sale or use of property under a business judgment standard. *Id.* at 82 (debtor failed to satisfy heightened scrutiny for sale to insider).

25. Relevant factors for determining whether there are sufficient business reasons to justify use of estate property outside the ordinary course include the proportionate value of the asset to the estate as a whole, the amount of time elapsed since the bankruptcy filing, the likelihood of proposing and confirming a plan in the near future, the effect of the proposed sale on any reorganization, the proceeds to be obtained with reference to any appraisals, and whether the asset is increasing or decreasing in value. *In re Lionel,* 722 F.2d at 1071. Each of these factors is focused on the "paramount goal" of a chapter 11, which is reorganization. *In re Ionosphere,* 98 B.R. at 175-76 (sound business reasons supported payment of prepetition wages to working employees to protect the business and to reorganize, but did not support payments to striking employees).

26. In this case, the Diocese fails to present any evidence of a good business reason for paying the Credibly Accused Priests, much less how the decision complies with the Diocese's fiduciary duty to creditors. Bishop McDermott's only justification for paying these priests is inadmissible hearsay that "based on Canon Law, the Holy See determined that the Priests could not be laicized or their benefits terminated." McDermott Aff., ¶15. The bankruptcy case and accompanying goal of reorganization are governed by civil law, not Canon Law.[5] There is no information to support heightened scrutiny of the payments, consistent with

---

[5] *See, e.g., Comm. of Tort Litigants v. Catholic Diocese of Spokane (In re Catholic Bishop of Spokane),* 329 B.R. 304, 321 (Bankr. E.D. Wash. 2005) (rejecting application of Canon Law to determine estate property).

the Diocese's fiduciary duty to conserve the estate for the benefit of creditors. Moreover, there is no information to support a sound business judgment, which would require a discernable decision by the Diocese to pay pension benefits to the Credibly Accused Priests (as opposed to other unspecified treatment), made on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the Diocese. Bishop McDermott does not state how payments to acknowledged abusers is in the best interests of creditors or the estate, or will further a reorganization. The Diocese speculates regarding liability concerns, but there is no evidence to support the existence of an actual risk.

27. Considering that accusations against the Credibly Accused Priests are undisputedly and admittedly credible, continuing to pay pension benefits to these individual can only undermine the morale of both the Diocese's current and former employees, as well as the Survivors.[6] Moreover, the Diocese's vague communication with the Holy See has the unfortunate appearance of the Diocese choosing to protect abusive priests ahead of the interests of Survivors. The Diocese characterizes the $3,900 per month pension payments as small (Debtor's Memorandum, ¶32), but over a 25-year period that benefit exceeds $1 million. The Credibly Accused Priests should not receive administrative priority payments in advance of a reorganization and before any Survivors' claims have been paid.

28. As the court recognized in *Ionosphere,* this case is in its early stages and cash reserves "should be used only when it is demonstrated that it is necessary and indeed critical that such funds should be expended." 98 B.R. at 179. The Diocese has failed to demonstrate a good

---

[6] *Compare In re Endo Int'l PLC,* 2022 Bankr. LEXIS 3208, *30 (Bankr. S.D.N.Y. Nov. 14, 2022) ("The Debtors have demonstrated that any cessation of payments under [contested benefit plans] could irreparably impair the Debtors' relationship with their employees and sink employee morale at a time when employee confidence in the business is undoubtedly critical.")

business reason to exercise its discretion to extend pension payments to the Credibly Accused Priests. The payments harm the creditor constituency and serve no benefit to the estate.

## CONCLUSION

For the foregoing reasons, the Committee objects to the Wage Motion to the extent that the Diocese seeks to continue making pension payments to the Credibly Accused Priests.

Date: March 11, 2025                                        Respectfully submitted,

**LEMERY GREISLER LLC**

*/s/ Paul A. Levine*
Paul A. Levine, Esq.
677 Broadway - 8th Fl.
Albany, New York 12207
Telephone: (518) 433-8800
Email   plevine@lemerygreisler.com

**-**and-

**PACHULSKI STANG ZIEHL & JONES LLP**
James I. Stang (*Pro Hac Vice* pending)
Brittany M. Michael (Admitted *Pro Hac Vice*)
Gail S. Greenwood (Admitted *Pro Hac Vice*)
780 Third Avenue, 34th Floor
New York, NY  10017
Telephone:  (212) 561-7700
Email:    jstang@pszjlaw.com
              bmichael@pszjlaw.com
              ggreenwood@pszjlaw.com

*Counsel to the Official Committee of Unsecured Creditors*