**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF VERMONT**

| | |
|---|---|
| In re:<br><br>ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT,<br><br>Debtor. | Chapter 11<br>Case No. 24-10205-HCZ |

**RMHS, INC.'S REPLY IN SUPPORT OF SALE MOTION**

RMHS, Inc., a Vermont non-profit corporation (the "Purchaser") formed to be the purchaser related to the *Motion for Entry of an Order under 11 U.S.C. § 363(f) Authorizing the Sale of Rice Memorial High School Free and Clear of All Liens, Claims, and Interests* [Dkt. No. 830] (the "Sale Motion"), hereby files this reply in support of the Sale Motion and in response to the Committee's objection to the Sale Motion [Dkt. No. 873] (the "Committee Objection").

**I. Rice Memorial High School Fulfills an Important Charitable and Educational Mission that Cannot Be Ignored Under Established Second Circuit Precedent**

Founded in 1917, Rice Memorial High School ("Rice") is one of the largest Catholic high schools in northern New England and among the most respected high schools – public or private, parochial or secular – in the entire state of Vermont. With an established reputation for its mission-driven culture, academic excellence, competitive athletics, and service learning opportunities, Rice educates approximately 400 students each year from not only northern and central Vermont, but from across the country and around the world.

Rice offers its students small class sizes and broad course offerings, including 4 Dual Enrollment Courses, 20 Advanced Placement classes, and 16 Honors classes. Its students are required to complete 80 service hours before graduation, engaging in various community building

tasks. Rice provides financial aid to approximately 40% of qualifying students each year in order to ensure that excellent educational opportunities are available and affordable for a diverse student body. Over 90% of its graduates enroll directly in four-year colleges and are accepted at top institutions like Princeton, Dartmouth, Cornell, Vanderbilt, Boston College, Notre Dame, Georgetown, Northwestern, Villanova, the Naval Academy, West Point, Tufts, and UVM. Rice alumni include notable business leaders, government officials, artists, authors, journalists, and poets. Additionally, Rice employs 67 faculty and staff, with a total annual payroll of nearly $5 million. As set forth in the Sale Motion, in addition to paying fair market value for Rice's assets, the Purchaser is firmly committed to fulfilling Rice's important charitable and educational mission to students and their families; to faculty and staff; and to the broader community.

The Committee Objection ignores established Second Circuit precedent that requires bankruptcy courts to consider a debtor's charitable and educational mission when evaluating a sale under Bankruptcy Code section 363(b). Particularly when the debtor is a non-profit or charitable organization – such as a hospital, school, or long-term care facility – bankruptcy courts within the Second Circuit have consistently held that the alignment of the proposed sale with the debtor's charitable mission, the welfare of beneficiaries and patients, and the financial viability of the purchaser's ability to continue that mission are all key considerations.

For instance, in In re HHH Choices Health Plan, LLC, 554 B.R. 697 (Bankr. S.D.N.Y. 2016), a non-profit senior housing and continuing care retirement community debtor sought to sell substantially all of its assets under Bankruptcy Code section 363. Two competing bids were received: one from another non-profit that proposed to continue operating the facilities in the same manner as the debtor, and another that would have retained some operations and discontinued others. The debtor wished to sell to the lower bidder in order to fulfill its charitable mission, while

the committee insisted on maximizing value. The bankruptcy court considered various non-price factors including whether each of the proposals fulfilled the charitable mission, the impact on residents and beneficiaries, the financial viability of the purchaser, creditor interests, and the board's business judgment. The court ultimately approved the lower-priced proposal favored by the debtor because it was more fully aligned with the debtor's mission of providing senior housing and care in the community.

Bankruptcy courts around the country uniformly apply the same analysis when evaluating proposed sales by non-profit and charitable debtors. See, e.g., In re United Healthcare Sys., Inc., No. CIV. A. 97-1159 (NHP), 1997 WL 176574 (D.N.J. Mar. 26, 1997) (Third Circuit case approving sale of Children's Hospital of New Jersey to bidder committed to keeping hospital open and providing $5 million in future investments); In re Brethren Care of S. Bend, Inc., 98 B.R. 927 (Bankr. N.D. Ind. 1989) (Seventh Circuit case approving sale to non-profit due to concerns about treatment of residents if sale to for-profit bidder approved); In re Parkview Adventist Med. Ctr., No. 15-20442, Dkt. No. 309 (Bankr. D. Me. Aug. 20, 2015) (First Circuit case approving private sale of faith-based hospital to buyer committed to continuing faith-based mission).[1]

Thus, contrary to the arguments in the Committee Objection, this Court must consider the continuation of Rice's charitable and educational mission when evaluating the Sale Motion. Not only does the Sale Motion propose a fair – and fair market – sale price based on an independent,

[1] The Committee cites the recent decision from the Diocese of Buffalo case in support of its view that only price matters. That decision is both distinguishable and wrongly decided. The sale in that case involved transferring a Catholic high school to a charitable foundation for only $300,000; by contrast, this case involves the sale of Rice for $4.3 million – a price that is almost fifteen times higher and entirely consistent with a contemporaneous fair market valuation of the property by a respected local broker. Moreover, the Diocese of Buffalo decision is contrary to the established Second Circuit law discussed above. In fact, the portion of the decision quoted by the Committee states a legal proposition that is jarringly opposed to that well-established precedent ("if the debtor chooses to sell property, it **must** adopt a sale process that is reasonably designed to **achieve the greatest net return**"). If applied literally, the decision would require a non-profit debtor to ignore its own charitable purpose and accept the highest offer even if it was not the best offer, and even if the offer was contrary to controlling state law and sections 363(d)(1) and 541(f) of the Bankruptcy Code. The Diocese of Buffalo decision is not consistent with established law.

third-party valuation, but it ensures a transfer of a key community resource to a mission-aligned buyer. The Purchaser is firmly committed to continuing Rice's faith-based, high-quality charitable and educational activities that serve approximately 400 students and employ 67 faculty and staff. In addition to providing $4.3 million of consideration paid into the bankruptcy estate, the sale will fulfill the Debtor's mission and serve the interests of constituents ignored by the Committee Objection – students and their families; faculty and staff; and the broader community.

## II. The Sales Process Properly Balanced Protecting Rice's Charitable and Educational Mission with Achieving a Fair Market Price

The Committee Objection mischaracterizes the sales process undertaken by the Debtor and the Purchaser, alleging – without support – that "[t]he buyer is the Diocese in a new wrapper" and that "the Diocese is selling to itself[.]" Committee Objection ¶ 3. The Purchaser is a Vermont non-profit corporation formed for the purpose of acquiring Rice's assets under the Sale Motion. It was formed by the executive committee of Rice's existing volunteer school advisory board, which is composed of private individuals who are parents, supporters, and/or alumni of Rice, including professionals from the legal, finance, and business communities. This group negotiated at arm's length with the Debtor not just about a sale price, but also about autonomy from the Debtor, which is a condition of the offer. While the Purchaser intends to continue Rice's charitable and educational mission uninterrupted, it is and will be separate from the Debtor from a financial and governance perspective. Post-closing, the Debtor's role will be religious in nature, overseeing only religious programming, curriculum, and mission; there are no other reserved authorities.[2]

[2] The Committee Objection also misapprehends the source of the Purchaser's financial wherewithal to close on the proposed transaction, alleging that "The same donor base that supports the Debtor will capitalize the buyer of the Debtor's asset." Committee Objection ¶ 24(e). More accurately, the same donors who now support Rice will continue to support Rice. The Debtor has not negotiated with those donors – the Debtor negotiated a purchase price with the Purchaser, and the Purchaser is actively engaging supporters of Rice to raise the necessary funds. The fact that these donors are Catholic and supporters and/or alumni of Rice proves nothing other than that the Purchaser has intelligently identified its likely donor base.

The Committee also alleges that the Purchaser's refusal to participate in a public sales process was intended to "***punish the estate***." Committee Objection ¶ 3(c) (emphasis added). This is entirely wrong. The Purchaser's sole motivation is to ***protect Rice*** and its students and families, its faculty and staff, and its charitable and educational mission. For that reason, the Purchaser was clear from the start of its negotiations with the Debtor that it would not participate in a public sales process because such a process would harm Rice. Putting a respected and operating school on the auction block would accomplish nothing other than undermining the confidence of students/families, faculty/staff, and other stakeholders about the future of the school. Indeed, concerns of this nature have already begun to emerge in the wake of the Committee Objection, reinforcing the Purchaser's belief that a public sale process would risk significant harm to the institution and its mission.

For these reasons, the Purchaser and the Debtor agreed on a process that would protect Rice's charitable and educational mission while ensuring fair value for the Debtor's bankruptcy estate – exactly what is required by the established Second Circuit precedent discussed above. The Debtor and the Purchaser agreed that the Purchaser would obtain an independent valuation of the property at its sole cost and expense, and then make an offer consistent with that valuation. That is exactly what the Purchaser did. The Purchaser has great confidence in its consultant and welcomes the opportunity to adduce his testimony at an evidentiary hearing to establish that the purchase price represents fair value.[3]

---

[3] If the Committee truly wishes to call an appraiser who even it does not find credible, it is free to do so. However, the Court should be aware that the largest real estate transaction in Chittenden County in 2025 involved a sale price of approximately $20 million for a highly specialized, secure building housing the Immigration and Customs Enforcement agency's "Law Enforcement Support Center." https://vtdigger.org/2025/06/20/ice-building-purchased-by-d-c-firm/. The Committee's purported expert therefore believes that the Rice property is 50% more valuable than that record transaction. This conclusion is both incredible and un-credible, and it should be disregarded.

**III. The Sale Motion Presents an Opportunity for Positive Progress in a Stalled Bankruptcy Case**

Recently, the Court expressed its frustration that little progress has been made in this chapter 11 case and that the case is stalled. The Sale Motion presents with an opportunity for positive progress – a sale that will bring $4.3 million of value into the estate, undiminished by broker commissions; a sale that will achieve fair market value for the Rice assets; a sale that will preserve Rice's charitable and educational mission to students, families, faculty, staff, and the broader community; a sale that will help make this case more than an exercise in estate professionals filing fee applications. The Purchaser therefore requests that the Court grant the Sale Motion and achieve positive progress in this case.

**IV. The Court Should Admonish the Committee and Its Counsel for Reckless Statements in the Committee Objection**

Finally, the Purchaser is deeply troubled and offended by the Committee's reckless statements in the Committee Objection about Rice. Specifically, in paragraph 51, the Committee states:

> Additionally, given the uncertainty regarding RMHS's legal entity status, the proposed order has an unknown impact on ***pending and future claims regarding child sexual abuse that occurred in connection with RMHS***. The release of the Purchaser from any liability related to the Property or currently held against the Diocese could result in the creation of new entity that holds RMHS's assets but shields those assets ***from future child sexual abuse claims related to abuse that occurred at RMHS***. Prior to entry of such an order, the Court should first determine the current legal status of RMHS, so all parties can be on notice and properly analyze the impact of the proposed order language.

Committee Objection ¶ 51 (emphasis added). The glaring problem with the Committee's statements is that the Committee knows full well that there are no known child sex abuse claims that "occurred in connection with RMHS" or "occurred at RMHS." The mere possibility that such

claims could be asserted in the future is woefully insufficient to disparage and defame the students and staff of Rice in a public court filing. Could a fire occur in a crowded theater? Yes. But if there is no fire, it is unlawful to shout "Fire!" just because a fire is theoretically possible. The Committee's allegations are equally as reckless, and the Court should admonish the Committee and its counsel for these knowingly unfounded and offensive statements about Rice as it welcomes back approximately 400 young people for a new academic year.

WHEREFORE, the Purchaser requests that the Court enter an order granting the Sale Motion.

Dated: August 28, 2026

Respectfully submitted,

*/s/ Jeremy R. Fischer*

Jeremy R. Fischer
**PRETI FLAHERTY**
One City Center, P.O. Box 9546
Portland, Maine 04112-9546
(207) 791-3000
jfischer@preti.com

*Counsel to RMHS, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served via this Court's CM/ECF system on all parties requesting CM/ECF notice.

Dated: August 28, 2026

*/s/ Jeremy R. Fischer*