**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF VERMONT**

In re:

Roman Catholic Diocese of Burlington, Vermont,[1]

Debtor.

Case No.: 24-10205-HZC
Chapter 11 Case

# MOTION TO DISMISS

1. On this exact date, two years ago, the Roman Catholic Diocese of Burlington, Vermont (the "Diocese") commenced this case for the express purpose of achieving a fair, comprehensive, and lasting resolution of claims of survivors of abuse (the "Survivors"), while preserving the Diocese's ability to continue its ministries and its pastoral, charitable, and educational mission. During this past two-year period, the Diocese acted in good faith, seeking to monetize its assets for the benefit of Survivors and engaging in negotiations with the Official Committee of Unsecured Creditors (the "Committee"), the Diocese's insurance carriers (the "Insurers"), and various other parties involved in this case.

2. Notwithstanding the Diocese's good-faith efforts, this case has unfortunately failed to produce a viable path toward a consensual plan of reorganization that compensates Survivors and enables the Diocese to continue its mission. Mediation and arm's-length negotiations failed to yield the compromises necessary to achieve the global resolution that chapter 11 is intended to facilitate. The Diocese approached these negotiations in good faith at every turn, but it cannot

[1] In accordance with Fed. R. Bankr. P. 2002(o) and 1005 and 11 U.S.C. § 342(c), as applicable, the Diocese's address is P.O. Box 2367, South Burlington, Vermont 05407, and its Employer Identification Number (EIN) is 03-0180730.

force a resolution that the relevant constituencies are not prepared to accept, and it cannot allow the case to continue indefinitely in the absence of a realistic prospect of confirming a plan.

3. At the same time, the administrative costs of remaining in chapter 11 continue to mount, with no end in sight. Professional fees and other administrative expenses are consuming resources that would otherwise be available to fund a distribution to Survivors and other creditors or to support the Diocese's ongoing charitable and religious operations. Every additional month the case remains pending without meaningful progress toward a plan further erodes the very recovery that chapter 11 was meant to preserve and enhance. Continuing to incur these expenses without a corresponding likelihood of successful reorganization is inconsistent with the purposes of the Bankruptcy Code and does a disservice to the Survivors, creditors, and the Diocese's parishioners and beneficiaries alike.

4. Under these circumstances, the Diocese concluded, in the exercise of its considered business judgment and only after careful deliberation, that dismissal of the case represents the most prudent and responsible course available. Continuing to administer this case would serve no legitimate reorganizational purpose, would not advance the interests of the Survivors or other creditors, and would only continue to deplete estate resources through ongoing administrative expense.

5. For these reasons, and as set forth more fully below, the Diocese respectfully requests that the Court dismiss the case pursuant to 11 U.S.C. § 1112. To be clear, the Diocese does not bring this Motion lightly. Dismissal was not the outcome the Diocese sought when it filed for relief under the Bankruptcy Code, and it is not an outcome the Diocese takes any satisfaction in seeking now.

## JURISDICTION, VENUE, AND STATUTORY BASIS FOR RELIEF

6. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Rule 5005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The petition commencing this Chapter 11 case was filed on September 30, 2024 (the "Petition Date"). The case is currently pending before this Court.

8. This Motion arises under 11 U.S.C. § 1112(b)(4)(A) and Bankruptcy Rule 1017. This Motion is filed under Bankruptcy Rules 9013 and 9014 and Local Rules 9013-1 to -6. Notice of this Motion is provided pursuant to Bankruptcy Rule 2002 and Local Rule 9013-4.

## GENERAL BACKGROUND

### I. THE DIOCESE COMMENCED THIS BANKRUPTCY CASE.

9. On the Petition Date, the Diocese filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

10. The Diocese continues to operate its business as debtor in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

11. There is presently no pending request or motion for appointment of a trustee or examiner.

12. The Diocese is a Catholic diocese serving the entire State of Vermont. Further background information regarding the Diocese may be found in the Affidavit of Bishop John J. McDermott in Support of Initial Pleadings and Pursuant to Local Rule 1007-1(i) (the "McDermott Affidavit") (ECF No. 13).

13. The Office of the United States Trustee appointed the Committee on October 22, 2024 (ECF No. 52).

## II. THE DIOCESE'S AND COMMITTEE'S INITIAL MEDIATION EFFORTS.

14. Immediately after the Committee's appointment and retention of counsel, the Diocese's counsel and Committee's counsel scheduled weekly meetings to allow the parties to communicate about all relevant matters of the Diocese's case. Since that time, counsel for the Diocese and Committee have met nearly every week and maintained open communications throughout the course of this case.

15. Based on conversations that began in those weekly meetings, the Diocese and Committee agreed to seek the appointment of two mediators to assist the parties in negotiating a resolution of the issues in this case.

16. On May 12, 2025, the Diocese filed its Motion for Entry of an Order Referring Parties to Global Mediation, Appointing Mediators, and Granting Related Relief (ECF No. 303), which the Committee subsequently joined (ECF No. 340).

17. On June 13, 2025, the Court entered its Order Referring Parties to Global Mediation, Appointing Mediators, and Granting Related Relief (the "Mediation Order") (ECF No. 352). In the Mediation Order, the Court appointed the Honorable William J. Fisher and Michael Marks (together, the "Mediators") to serve as mediators in the case and further ordered that mediation would conclude within 60 days after the entry of the Mediation Order.

18. The Committee and the Diocese appeared and participated at a mediation session from July 28 through July 29, 2025, and agreed to mediate again on September 11 and 12, 2025. Based on that agreement, the Court entered an order amending the Mediation Order to extend mediation until September 19, 2025 (ECF No. 431).

19. After the Diocese and Committee mediated on September 11 and 12, 2025, the Court further extended the timeframe for mediation to December 31, 2025 (ECF No. 476). The Diocese and Committee then participated in another mediation session on December 15, 2025.

20. After the December 15, 2025, mediation session, the Diocese and the Committee believed they were close to negotiating a resolution and sought to file a joint plan by February 27, 2026 (ECF No. 609), but ultimately could not agree on the applicable terms.

21. On May 8, 2026, the Diocese and Committee filed a Joint Motion to Further Amend Order Referring Parties to Global Mediation, Appointing Mediators, and Granting Related Relief (ECF No. 742). After a hearing on May 19, 2026, the Court initially denied the joint motion (ECF No. 777).

22. On June 24, 2026, the Diocese filed a Renewed Motion to Further Amend Order Referring Parties to Global Mediation, Appointing Mediators, and Granting Related Relief (ECF No. 805) and the Committee filed a joinder seeking to add the Parishes and Schools as mediation parties (ECF No. 807).

23. At a hearing on July 10, 2026, the Court agreed to extend the mediation deadline to October 16, 2026, but declined to further amend the Mediation Order (ECF No. 822).[2]

24. On August 3, 2026, representatives of the Diocese, Committee, Parishes, Schools, and Insurers all participated in a mediation session with the Mediators. At the conclusion of the mediation session, the parties and the Mediators agreed to hold a further in-person mediation session in Burlington, Vermont from September 28 through September 29, 2026.

---

[2] On August 18, 2026, the Court entered an order further clarifying that the Parishes would be bound as mediation parties under the Mediation Order (ECF No. 867).

25. At the latest mediation session and as described in more detail below, the Diocese made a global proposal on behalf of the Diocese, Parishes, Parish Trusts, Schools, and other Catholic entities that the Diocese believes is the highest and best offer the Committee will receive from these parties absent full adjudication of the pending litigation, as further described below.

26. As of the date of this Motion, the Diocese's proposal has not been accepted.

## III. THE DIOCESE'S ONGOING ATTEMPTS TO MONETIZE ASSETS FOR THE BENEFIT OF THE SURVIVORS.

27. While negotiating with the Committee, and despite not reaching any resolution, the Diocese sought to liquidate its real property assets for the benefit of the Diocese's creditors, including the Survivors.

28. On August 26, 2025, the Diocese filed a motion to sell real property commonly referred to as "Loretto Home" (ECF No. 448). The Court granted the motion and approved the sale (ECF No. 585). The sale ultimately closed on June 11, 2026, and the Diocese continues to hold approximately $976,680 in net proceeds from the sale in a segregated account.

29. On May 15, 2026, the Diocese filed a motion to sell real property the Diocese was using as its principal place of business, commonly referred to as the "Diocesan Office" (ECF No. 751). The Court granted the motion and approved the sale (ECF No. 786). The sale closed on September 15, 2026, and the Diocese holds approximately $3,118,125 in net sale proceeds in a segregated account.

30. On July 15, 2026, the Diocese filed a motion to sell the real property used by Rice Memorial High School to a newly-formed non-profit (the "Rice Purchaser") for $4.3 million and the waiver of a $15.67 million claim asserted by Rice Memorial High School against the Diocese (ECF No. 830). The Committee objected to the sale, arguing that the real property should be marketed further (ECF No. 873). The Court scheduled an evidentiary hearing for November 19,

2026, and the Diocese, the Committee, and the Rice Purchaser are preparing for that hearing, but also continue to attempt to negotiate a resolution and are hopeful that a resolution will be reached prior to the hearing. If the Court approves the sale, the Diocese will hold the $4.3 million less any closing costs in a segregated account.

31. In consultation with the Committee and through a specialized broker, the Diocese engaged in a confidential marketing process of its three residential care homes (the "Homes"). After engaging in this process, Vermont Catholic Charities ("VCC") made the highest and best offer to purchase all three properties for $4.27 million. The Diocese is preparing a motion to sell the Homes to VCC, which the Diocese anticipates the Committee will support. If the Court approves the sale, the Diocese will hold the $4.27 million less any closing costs in a segregated account.

32. Assuming the Court approves the sales of Rice Memorial High School and the Homes, the Diocese anticipates holding approximately $12,664,805 of sale proceeds in the segregated account.

33. In addition to selling its assets, the Diocese also engaged in cost-savings measures, including reducing its employee base by half and cutting its expenditures.

## IV. THE LITIGATION WITH THE PARISHES.

34. From the beginning of this case, the Diocese took the position that the assets of the various parishes operating in the region served by the Diocese (the "Parishes"), the high schools, including Rice Memorial High School and Mount St. Joseph Academy (collectively, the "Schools"), and trusts formed in 2006 for the purpose of holding the assets for the benefit of the communities served by the Parishes (the "Parish Trusts") do not constitute property of the estate

(ECF No. 13). And since the Committee's appointment, the Committee has taken the position that the assets of the Parishes, Schools, and Parish Trusts do constitute property of the estate.

35. In December 2025 and January 2026, nearly 15 months after the filing of this case, certain Survivors initiated state court actions against certain of the Parishes:

a. *P.A. v. Saint Monica Parish in Barre, Mater Dei Parish in Newport, et al.*, Washington Unit, Docket No. 26-CV-00421;

b. *D.S. v. Christ the King Parish in Rutland, St. Augustine Parish in Montpelier, et al.*, Washington Unit, Docket No. 25-CV-05691;

c. *M.F. v. Christ the King Parish in Rutland, et al.*, Washington Unit, Docket No. 25-CV-05690;

d. *M.R. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No. 25-CV-05669;

e. *C.C. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No.25-CV-05708;

f. *C.B. v. Christ the King Parish, et al.*, Chittenden Unit, Docket No. 25-CV-05703; and

g. *Doe v. St. John the Baptist, et al.*, Chittenden Unit, Docket No. 26-CV-00066.

36. On July 10, 2026, nearly 22 months after the filing of this case, the Committee filed its Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Standing, and Authority to Prosecute Certain Causes of Action on Behalf of the Debtor and Its Estate (ECF No. 820), which the Court ultimately granted (ECF No. 844). The Committee then commenced an adversary proceeding (the "Adversary Proceeding") against the Parishes, Parish

Trusts, Schools, and the Diocese seeking a determination that the assets of the Parishes, Parish Trusts, and Schools constitute property of the estate (ECF No. 849).

37. On September 27, 2026, the Court denied the motions to dismiss filed by the Diocese and the Parishes and Parish Trusts (Adv. ECF Nos. 28–29), and answers for the Diocese and the Parishes are due October 13, 2026. As of the date of this Motion, the Parishes' motion to withdraw the reference (Adv. ECF No. 13) remains pending. The Adversary Proceeding has not moved past the initial pleading stage.

38. Certain of the Parishes separately filed a declaratory judgment action before the United States District Court for the District of Vermont, captioned *Christ the King Parish in Rutland, et al v. P.A. et al*, with case number 26-249. The Committee filed a motion to stay the action (ECF No. 856), which the Court granted (ECF No. 882), and the Parishes ultimately appealed (ECF No. 883). The appeal remains pending.

39. Based on the initial litigation between the Parishes and the Committee, the Diocese expects that the litigation will not conclude for years and likely require the bankruptcy estate to incur significant legal expenses.

## V. THE INVOLVEMENT OF THE INSURERS.

40. When the Diocese filed its case, the Diocese could not locate insurance policies that provided applicable coverage for the Survivor claims during the relevant time periods (ECF No. 13).

41. On August 18, 2025, the Diocese filed an application to retain an insurance archaeologist (ECF No. 430), which the Court granted (ECF No. 435).

42. Through the archeologist's efforts, the Diocese ultimately located policies held by two different insurers, Interstate Fire & Casualty Company ("Interstate") and Certain Underwriters

at Lloyd's London, Riverstone Insurance UK Limited ("LMI"), in December 2025. Once Interstate and LMI became involved in the case, the Diocese sought to engage with both insurers regarding the policies.

43. Interstate and LMI provided the Diocese with extensive document and other information requests, to which the Diocese diligently responded. Interstate and LMI participated in the August 3, 2026, mediation session and the September 28 and 29, 2026, mediation session, but no deal has been reached.

44. On September 14, 2026, the Diocese received notice of additional insurance policies that were recently discovered through the archaeologist's efforts held by four additional insurers. While these insurers have not yet appeared in this case or otherwise participated, the Diocese anticipates receiving similar document and information requests from these additional insurers.

45. The Diocese expects that any ultimate resolution with the Insurers will require significant administrative expenses and will likely take a long period of time.

## VI. THE DIOCESE'S BEST AND FINAL PROPOSAL.

46. In light of the expected litigation costs and the need to resolve all of the issues that exist between the Committee and the Diocese, Parishes, Parish Trusts, and Schools, the Diocese worked to compile a global settlement proposal to the Committee of approximately **$29.43 million**, which would be in addition to any settlement with the Insurers.

47. The Diocese made the proposal to the Committee at the end of the last mediation session and indicated that it was the highest and best offer the Diocese and the other Catholic entities could make. The Diocese further explained that portions of the funding of the proposal were contingent on reaching a resolution now and would not exist in the future.

48. The Committee ultimately declined to accept the proposal. Due to the Committee's decision, the Diocese does not believe continued mediation in this case will be productive or successful.

49. Consequently, rather than continue to expend estate resources solely for the benefit of the estate professionals, the Diocese files this Motion and requests dismissal of its bankruptcy case.

## ARGUMENT

50. Section 1112 of the Bankruptcy Code governs dismissal or conversion of chapter 11 cases and provides that:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

11 U.S.C. § 1112(b)(1).

51. Section 1112(b)(4) of the Bankruptcy Code further provides examples of "cause" required for dismissal,[3] including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).[4]

[3] While 11 U.S.C. § 1112(b) provides for dismissal or conversion of a chapter 11 case, 11 U.S.C. § 1112(c) bars conversion of a case where the debtor is not a moneyed business or a commercial corporation unless the debtor requests the conversion. Here, the Diocese is neither a moneyed business nor a commercial corporation and the Diocese does not seek a conversion of its case. Therefore, if the Court determines cause exists under 11 U.S.C. § 1112(b)(4)(A), then the appropriate relief is dismissal of the Diocese's chapter 11 case.

[4] The other examples of "cause" are not applicable to this case. *See generally* 11 U.S.C. § 1112(b)(4)(B)–(P). Moreover, courts across the Second Circuit treat the list as illustrative and not exhaustive, and remain free to consider other factors. *In re JJ Arch LLC*, 663 B.R. 258 (Bankr. S.D.N.Y. 2024); *see also In re Kors, Inc.*, 13 B.R. 676 (Bankr. D. Vt. 1981).

52. The moving party bears the initial burden of demonstrating cause, but the "burden shifts to the respondent to demonstrate by evidence the unusual circumstances that establish that dismissal or conversion is not in the best interests of creditors and the estate." *In re JJ Arch LLC*, 663 B.R. 258, 272 (Bankr. S.D.N.Y. 2024).

## I. THE DIOCESE CONTINUES TO SUFFER SUBSTANTIAL LOSSES AND DIMINUTION OF THE BANKRUPTCY ESTATE.

53. When examining whether a debtor is suffering from substantial or continuing loss, courts note that the loss may be substantial or continuing. *In re Sakon*, 617 B.R. 7, 15 (Bankr. D. Conn. 2020), *aff'd sub nom. Sakon v. A&F Main St. Assocs., LLC*, No. 3:20-CV-00353 (JAM), 2021 WL 165014 (D. Conn. Jan. 19, 2021); *see also In re Creekside Sr. Apts., L.P.*, 489 B.R. 51, 61 (B.A.P. 6th Cir. 2013); *see generally In re Sillerman*, 605 B.R. 631, 656 (Bankr. S.D.N.Y. 2019).

54. The losses suffered by a debtor need not be large as "[a]ll that need be found is that the estate is suffering some diminution in value." *In re Sakon*, 617 B.R. at 15. "If the loss is sufficiently large under the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the first prong is demonstrated without a requirement that the loss be continuing." *In re Adamo*, No. 14-73640-LAS, 2016 WL 859349, at *11 (Bankr. E.D.N.Y. Mar. 4, 2016) (quoting 7 *Collier on Bankruptcy* ¶ 1112.04[6] (16th ed. rev.)). Post-petition negative cash flow and an inability to pay current expenses evidence the continuing loss the provision requires. *In re The Ledges Apartments*, 58 B.R. 84, 87 (Bankr. D. Vt. 1986); *In re Sakon*, 617 B.R. at 16.

55. As noted in the McDermott Affidavit, the Diocese previously sold its most significant assets and engaged in a policy-buy back with another of the Diocese's insurers pre-petition, leaving minimal assets remaining in this case. The Diocese's monthly operating reports

confirm this, reflecting "revenue" that fails to cover, or barely covers, the operating expenses of the Diocese (ECF Nos. 724, 765, 803, 838, 869, 901). Thus, on a cash flow basis, the Diocese barely receives sufficient revenue (and in some months does not), in the form of donations and contributions from the Parishes, to cover its operating expenses.

56. Sections 328, 503, and 507 of the Bankruptcy Code require the Diocese to pay the administrative expenses of the case, which include not only the fees incurred from the Diocese's professionals, but also the fees and expenses of the Committee's professionals. As of the date of this Motion, the Diocese has paid nearly $1,249,254 to the retained professionals involved in this case, including $789,473 paid to the Diocese's professionals and $459,781 paid to the Committee's professionals.

57. The Diocese has accrued an additional $1,872,970 in unpaid professional fees, including approximately $698,305 owed to the Diocese's professionals for bills through August 2026 and $1,174,665 owed to the Committee's professionals for bills through July 2026. Except for the sale proceeds held in the segregated account, the Diocese would lack sufficient funds to pay all of the professional fees at this time.

58. The existing accrued and unpaid professional fees alone demonstrate the substantial losses suffered by the Diocese in this case, but the Diocese anticipates continued losses due to the expected significant professional fees in relation to the litigation between the Committee and the Parishes.

59. As the Diocese can no longer bear the burden of these administrative expenses, and as the continued accrual of further administrative expenses serves only to reduce the already limited assets available to the Diocese's creditors—including the Survivors—the Debtor's burden as to this first prong is clearly satisfied and the burden shifts to any party opposing the Motion to

prove that the Diocese is not suffering substantial losses and diminution of the estate. Indeed, every dollar spent on professional fees is a dollar that will not reach the Survivors. The Diocese should not be required to continue hemorrhaging estate resources in a case that has no realistic prospect of producing a confirmable plan.

**II. NO REASONABLE LIKELIHOOD OF REHABILITATION EXISTS.**

60. Rehabilitation "implies the re-establishment of a sound financial basis, a concept which necessarily involves establishing a cash flow from which current obligations can be met." *In re Sakon*, 617 B.R. at 16 (quoting *In re Kanterman*, 88 B.R. 26, 29 (Bankr. S.D.N.Y. 1988)); *see also In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) ("[R]ehabilitation does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include an orderly or complete liquidation. In this context, rehabilitation means to put back in good condition and reestablish on a sound basis. It signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met."); *In re The Ledges Apartments*, 58 B.R. at 87 ("Rehabilitation is not reorganization. Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may not include liquidation. As the term is used in section 1112(b)(1), it means 'to put back in good condition; re-establish on a firm, sound basis.'" (quoting *In re Kors, Inc.*, 13 B.R. 676 (Bankr. D. Vt. 1981))).

61. As stated by Bishop McDermott in the McDermott Affidavit, the Diocese filed this case for two stated purposes: (a) to compensate, as fairly and as equitably as possible, all remaining Survivors; and (b) continue the Diocese's essential ministries and functions associated with its mission (ECF No. 13). After analyzing the requirements of 11 U.S.C. § 1129 and the need for the Survivors to vote in favor of any plan, the Diocese determined that the only way to confirm a plan

that achieved the Diocese's goals in this case was to negotiate a settlement with the Committee that would result in a joint plan of reorganization.

62. Unfortunately, after two years, the Diocese is no closer to negotiating a joint plan with the Committee. At the most recent mediation session, the Diocese, the Parishes, the Parish Trusts, the Schools, and VCC made a global proposal to resolve their respective issues with the Committee and fund a joint plan of reorganization in the amount of approximately $29.43 million—which would average approximately $247,000 per Survivor and would be in addition to any settlements negotiated with the Insurers. The Committee declined to accept that proposal. Because the Committee declined the Diocese's highest and best offer, there is no reasonable basis to believe that further negotiations will yield a different result. The Diocese has exhausted every avenue for consensual resolution, and continued administration of this case will not change that reality.

63. Based on the two-years of failed mediation and the rejected best-and-final proposal, the Diocese has satisfied its burden of proof as to the second prong of 11 U.S.C. § 1112(b)(2) and the burden shifts to any opposing party to prove that reasonable likelihood of rehabilitation exists.

## III. DISMISSAL IS IN THE BEST INTERESTS OF THE PARTIES, INCLUDING THE SURVIVORS.

64. As the Bankruptcy Court does not permit the conversion of a case where the debtor is not a moneyed business or a commercial corporation unless the debtor requests the conversion, the Court need not examine the "best interests of creditors and the estate." 11 U.S.C. § 1112(c). However, to the extent the Court considers it, a dismissal is in the best interests of creditors and the estate.

65. The Bankruptcy Code does not define "best interests of creditors and the estate," rather courts employ a totality of the circumstances approach. *See generally* 11 U.S.C. §§ 101,

1112; *In re Giuliani*, 661 B.R. 493, 505–07 (Bankr. S.D.N.Y. 2024). In connection with that totality of the circumstances approach, courts in the Second Circuit generally look to ten different factors. *In re BH S&B Holdings, LLC*, 439 B.R. 342, 346–47 (Bankr. S.D.N.Y. 2010). However, many of these factors are inapposite here because they require the Court to analyze the benefits of a chapter 7 liquidation which serves no purpose because, under 11 U.S.C. § 1112(c), the Diocese is neither a moneyed business nor a commercial corporation, and the Diocese does not request conversion.

66. The remaining, non-liquidation factors include:

a. Whether some creditors received preferential payments;

b. Whether there would be a loss of rights granted in the case if it were dismissed;

c. Whether the debtor would simply file a further case upon dismissal;

d. In assessing the interest of the estate, whether dismissal would maximize the estate's value as an economic enterprise;

e. Whether any remaining issues would be better resolved outside the bankruptcy forum;

f. Whether the estate consists of a "single asset";

g. Whether the debtor engaged in misconduct;

h. Whether a plan has been confirmed and whether any property remains to be administered; and

i. Whether appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns

*In re BH S&B Holdings, LLC*, 439 B.R. at 346–47.

67. Here, the relevant factors weigh decisively in favor of dismissal. No creditors have received preferential payments, and no rights would be lost through dismissal that could not be pursued in state or federal court. The Diocese has no intention of filing a subsequent bankruptcy

case. No plan has been confirmed, and no property remains that requires bankruptcy administration; the Diocese has already liquidated its principal real estate assets and holds the proceeds in segregated accounts. There has been no allegation of debtor misconduct that would warrant the appointment of a trustee.

68. Finally, the remaining issues—particularly the dispute over whether Parish and Parish Trust assets constitute estate property reachable by creditors, including the Survivors—can be resolved outside the bankruptcy forum in state or federal court, including in the pending state and federal court actions. The Committee's adversary proceeding essentially focuses on two issues: (a) whether the assets of the Parishes and the Parish Trusts are property of the estate and, in the alternative; (b) whether the transfer of the assets to the Parish Trusts in 2006 are avoidable under Vermont's Voidable Transactions statute. Neither issue requires a bankruptcy forum to adjudicate.

69. First, the issue of whether the Survivors may collect against assets of the Parishes and the Parish Trusts is an issue that can be resolved either: (a) by Survivors bringing claims directly against specific parishes, which certain Survivors sought to do in the pending state court actions already; or (b) through similar claims that the Parish and Parish Trust assets are the assets of the Diocese, whether it be under a reverse veil piercing theory, self-settled trust theory, or some other legal theory. Second, any voidable transfer claim clearly can be brought in state or federal court under Vermont's Voidable Transactions statute.

70. Moreover, the Diocese anticipates that the litigation between the Committee and the Parishes and Parish Trusts will take years to complete, remains highly speculative, and will almost certainly result in numerous motions, appeals, and other filings. The bankruptcy estate simply cannot fund years of litigation given the Diocese's current financial outlook and would

require the Diocese to use the property sale proceeds to make payments to estate professionals rather than compensate the Survivors.

71. In short, the only party that benefits from the continued administration of this case are the professionals of the estate—not the Survivors, not the other creditors, and not the Diocese. Dismissal will preserve estate resources and allow the Diocese and the Survivors to pursue resolution through alternative means, free from the mounting costs of chapter 11 administration. Accordingly, the Diocese respectfully submits that dismissal is in the best interests of creditors and the estate.

**CONCLUSION**

72. For the foregoing reasons, the Diocese respectfully requests that the Court grant this Motion and enter an order dismissing the Diocese's chapter 11 case. Dismissal is the only outcome that will preserve estate resources, protect the interests of the Survivors and other creditors, and bring to a close a case that, despite the Diocese's good-faith efforts, has no reasonable likelihood of producing a confirmable plan of reorganization.

Dated: September 30, 2026

*/s/ Steven R. Kinsella*

Raymond J. Obuchowski
**OBUCHOWSKI LAW OFFICE**
1542 Route 107, PO Box 60
Bethel, VT 05032
(802) 234-6244
ray@oeblaw.com

James L. Baillie (*pro hac vice*)
Steven R. Kinsella (*pro hac vice*)
Samuel M. Andre (*pro hac vice*)
Katherine A. Nixon (*pro hac vice*)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000
jbaillie@fredlaw.com
skinsella@fredlaw.com
sandre@fredlaw.com
knixon@fredlaw.com

**ATTORNEYS FOR THE ROMAN CATHOLIC DIOCESE OF BURLINGTON, VERMONT**